# David E. Harbaugh v. The People on the relation of Edward V. Cicott.

*Special questions to jury: When answers inconsistent with general verdict.* As to special questions to the jury, where a verdict is given for the party holding the affirmative of the question at issue, and the jury in answer to special questions submitted to them negative a fact, or say they are unable to find it, which the party holding the affirmative must establish in order to entitle him to a verdict, or if where a verdict is given for the other party, they find in answer to such questions facts sufficient to establish the issue, then in either case the special finding is inconsistent with the verdict, and will control it.

*Special questions to jury: Statute construed: What proper questions to be submitted.* Proper interrogatories upon particular questions of fact material to the issue, and involving legal consequences which would have a controlling force in reaching a conclusion, should upon request be submitted to the jury; and though the jury cannot be compelled to answer them, a failure to answer or find any affirmative fact essential to sustain the verdict will have the effect to nullify the verdict and result in a mistrial.

*Elections: Special questions to jury: Number of illegal votes.* Where in an election controversy it was conceded the respondent by the official returns had a majority of one, and the relator sought to overcome this by showing that certain votes cast for the respondent were illegal, and the respondent in turn undertook to show that illegal votes were cast for the relator, it is held the parties had a right to have proper questions, proposed for the purpose of ascertaining whether certain alleged illegal voters voted, for whom they voted, and whether they were legally entitled to vote, submitted to the jury, and that their rejection was error.

33 MICH.—31.

HARBAUGH v. CICOTT.

*Elections: Evidence: Appearance of folded ticket: Source of information.*
The testimony of a witness that two men voted who were not registered voters, that he saw their ballots as they were handed by the voters to the inspector and that he is *confident* they were straight democratic tickets, is not within the ruling in *16 Mich., 312*, as to testifying from the appearance of a folded ticket, where it does not appear that was his only source of information.

*Special questions to jury: Admitted facts.* The admission of a fact upon the trial does not preclude the opposite party from putting a special question requiring the jury specifically to find the fact.

*Elections: Special questions to jury: Registry.* It being shown that a certain person named, who was claimed to be an illegal voter, voted at a certain place, it was competent to ask the jury to find specially whether he was duly registered in that ward, since if duly registered he was *prima facie* entitled to vote.

*Special questions to jury: Application of legal principles to the evidence.* It is not a valid objection to special questions to the jury as to whether a named person was "duly registered," or was a "legal voter," and "if not, why not," that it requires them to pass upon questions of law; the application of legal principles to the evidence in the case, and to draw conclusions therefrom, is not beyond the province of the jury.

*Special questions to jury: Inconclusive inquiries.* Questions which are inconclusive, and which, no matter how answered, would not be inconsistent with the verdict, may properly be withheld from the jury

*Special questions to jury: Policy: Legislative questions.* The question of the wisdom or propriety of permitting special questions to be submitted to the jury, is one to be addressed, not to the courts, but to the legislature.

*Electors: Voting twice: Mistake: Illegal votes.* One who has first by mistake voted in the wrong precinct, and upon discovering his mistake has requested and procured the inspectors to withdraw and cancel a ballot such as he asserted he had voted, has no right afterwards to vote again in his proper precinct; and his second vote is illegal.

*Inspectors of election: Canceling ballot.* Inspectors of election have no authority, on the assertion of one who claims to have voted by mistake in the wrong precinct, to withdraw from the ballot box and destroy a ballot which he identifies as the one, or similar to the one he had voted.

*Electors: Registry: Presumptions: Residence.* The presumption of qualifications as a voter, arising from the registry, covers all the essential requisites to a right to vote, including residence within the ward the necessary time.

*Residence: Temporary absence: Intention.* The temporary absence of a person or his family, though extending over a series of years, does not necessarily, without regard to his intentions, make him lose his residence, or deprive him of his rights as an elector.

*Elections: Jury trial: Special questions: Failure to answer: Mistrial.* In an election controversy where the issue turned on the question whether illegal votes had been cast, evidence having been introduced of illegal votes on both sides, the answer of the jury to special questions as to how many illegal votes were cast for each, that they do not know, is inconsistent with their general verdict against the party who had received according to the official returns the majority of the votes, and demonstrates that there has been a mistrial.

*Heard January 5 and 6. Decided January 11.*

Error to Wayne Circuit.

HARBAUGH *v.* CICOTT.

*George H. Prentis* and *Alfred Russell,* for plaintiff in error.

*J. W. Romeyn, E. W. Meddaugh* and *Theodore Romeyn,* for defendant in error.

MARSTON, J:

The relator filed an information in the nature of a *quo warranto* to inquire by what warrant the respondent held or exercised the office of police justice of the city of Detroit.

A number of questions* were submitted to the jury upon which they were instructed to find specially, and some questions the court would not permit to be submitted to the jury. Error is assigned upon this refusal; also upon the refusal of the court to render judgment for the respondent upon the evidence of his official majority and the failure of the

---

* The questions submitted on behalf of the relator were as follows:

1. Was Tisler's ballot, or one just like it, afterwards withdrawn from the ballot box and destroyed by the inspectors, and not included in their returns?

2. Did Robert McClatchey's family reside in Royal Oak at the time of the November election, 1873, and had his family resided there for several years immediately preceding said election?

3. Was he a married man?

4. Did he reside with his family, except while doing business in Detroit during the week?

These questions were each answered, "*yes.*"

The questions proposed by respondent were as follows:

1. Did Nicholas Tisler cast two ballots at the election in November, 1873, in the seventh ward of Detroit, and both said ballots for Edward V. Cicott for police justice?

2. Did Andrew Lehner cast a vote for said Cicott in the second district of the tenth ward of said city at said election?

3. Did a man calling himself Moran vote for said Cicott in said second district?

4. Was said Moran registered?

5. Did a man whose name is unknown, and who was not registered, the inspectors not being able to find his name on the registry, vote for said Cicott in said district?

6. Did two men personating James Flanigan and Daniel Eastman, illegally vote for said Cicott in the third ward?

7. Did Robert Smith vote for said Cicott in the third ward?

8. Was he registered?

9. Did James Melvin vote for said Cicott in the third ward?

10. Was he registered?

11. Did C. McKinney vote for said Cicott in the third ward?

12. Was he registered?

HARBAUGH *v.* CICOTT.

jury to answer how many illegal votes were cast for either party, and also upon the charges and refusals to charge the jury.

The statute under which questions are submitted to the jury has been before this court several times. In *Crane v. Reeder, 25 Mich., 316,* it was said: "No question should have been put to the jury which was not material to the inquiry upon which they were to enter; and upon every material question one party or the other would have held the affirmative, and unless he made out his case upon it by the evidence, should have had a finding against him upon it. Every fact essential to a party's case or defense which he fails to prove, is considered as not established, and must be negatived in the conclusions of the jury; it will not do to ignore it."

13. Did Alfred Davis vote for said Cicott in the third ward?
14. Was he registered?
15. Did Robert McClatchey have his regular boarding house in the third ward of Detroit?
16. Was he duly registered in said third ward at the time of said election?
17. Did Henry Clay, George Washington and old man Linn vote at said election for said Harbaugh in the first precinct of the sixth ward?
18. Were their names on the poll list of said district?
19. If you find that they voted, under what names respectively did they vote?
20. For whom did George Galstu vote at said election for police justice?
21. Had Thomas Ward any intention of abandoning his residence in the third ward and taking up his residence in Windsor and not returning?
22. Was Thomas Ward's name on the poll list of said third ward at said election?
23. Did Charles Flood, William Means and Robert Gimble vote in the second ward at said election?
24. Were either of them on the poll list?
25. If you find that they voted for police justice, for whom did they vote?
26. If you find they voted, under what names respectively did they vote?
27. For whom did William Bruce vote for police justice?
28. Was he a legal voter?
29. If not, why not?
30. Did William Stimson, Jack Law and Robert Henkle vote in the second ward at said election?
31. If they did vote, for whom did they vote respectively for police justice?

HARBAUGH *v.* CICOTT.

In *Sheehan v. Barry, 27 Mich., 224,* it was held that a question the answer to which, whether in the affirmative or negative, would not be inconsistent with the general verdict could not, therefore, affect the verdict, and ought not to be submitted. In *Dubois v. Campau, 28 Mich., 306,* it was said that the questions to be submitted are required to be particular questions of fact which involve legal consequences, and which would have a controlling force in reaching a conclusion; and in *Frankenberg v. First National Bank, supra, p. 46,* it was held that questions, the answers to which would be inconclusive, should not have been submitted.

Now, while it may be very difficult to lay down a general rule so clear that he who reads need not err, yet we think it is not at all difficult in the light of the above decis-

---

32. Are their names on the poll list?

33. Who gave William Bruce the ballot which he voted? William Enos, Arthur Gore or Thomas Gore?

34. Where was said ballot given to said Bruce?

35. If Jack Law voted, under what name did he vote?

36. Did said Law vote the next man after William Bruce, as stated by Thomas Gore?

37. Did Henry Atkinson, George Jarvis, William Stimson and John Crawley arrive in Detroit with Robert Walsh from Cleveland on Sunday before election, as stated by said Walsh?

38. Did they vote in the second ward at said election?

39. Were their names on the poll list of said second ward?

40. If they voted, under what names did they respectively vote?

41. If they voted, for whom did they respectively vote for police justice?

42. How many illegal votes were cast for Mr. Cicott?

43. How many illegal votes were cast for Mr. Harbaugh?

44. Was William Bruce the adopted son of Mrs. Bruce of Malden?

45. Who were his parents, and what were their names?

46. Where was William Bruce born?

47. How long had William Stimson lived in Detroit?

48. State whether he was a native or foreign born citizen?

49. If he was foreign born, had he his second or full papers of citizenship?

Objection being made to those numbered 3, 4, 5, 6, 16, 28, 29, 33, 34, 36, 37, 44 and 45, the court declined to submit them.

1, 2, 21 were answered "*yes,*" 7, 8, 9, 10, 11, 12, 13, 14, 15, 17, 18, 22, 23, 24, 30, 32 and 39 were answered "*no;*" 19, 25, 26, 31, 35 and 49 were not answered at all; 20, 27, and 41 were answered "*Harbaugh;*" 38 was answered "*all but Stimson;*" 40, 42, 43, 47, and 48 were answered, "*don't know;*" 46 was answered, "*Canada.*"

ions, to determine whether a given question should be submitted to the jury or not, and if submitted, what the effect of the answer, or failure to answer, upon the verdict would be.

Upon the trial of a cause there is always one or more questions at issue and upon which one side or the other holds the affirmative. If the jury finds a verdict in favor of the party holding the affirmative, and in answer to certain questions submitted to them, answer in the negative, or say they are unable to find a fact which the party holding the affirmative must establish in order to entitle him to a verdict, then the answers are inconsistent with their general verdict, and would control it. Or if they should find a verdict in favor of the party not holding the affirmative of the issue, and yet in answer to questions submitted to them should find that the party holding the affirmative had established the issue, here again the special finding would be inconsistent with their general verdict, and would control it.

Thus, by way of illustration, an action is brought upon a promissory note against the maker and endorser. An affidavit is filed denying the execution of the note, and upon the trial it is further claimed that the note, if executed, has been paid. Here the plaintiff, in order to recover, must prove the execution of the note, and the further fact that it was duly protested and notice given the endorser in order to hold him. The jury render a verdict for the plaintiff for the amount of the note, and in answer to questions submitted find that the note was forgery, or they are unable to agree whether the alleged maker ever executed it. Such a finding would be inconsistent with their verdict. Or should they find that it was properly executed, but was not protested, or that no notice of protest was given the endorser, or that they don't know whether notice was given the endorser or not, in either case the answer would be inconsistent with their verdict. Should they, however, render a verdict of no cause of action, and in answer to questions submitted find the note properly executed, duly protested and notice given, and further say that the note had not been

paid, or that they did not know whether it had been paid or not. Here again the special finding would be inconsistent with the general one. There would in either case be a failure to agree upon and find one or more facts essential to sustain their general verdict, and which properly they should have found before they could render such a verdict as they did. The parties have a right, therefore, to test the correctness of their general verdict in this way. And one or more interrogatories upon particular questions of fact material to the issue, and involving legal consequences which would have a controlling force in reaching a conclusion, may be submitted to the jury, and the court cannot decline, when requested, to submit such questions. The jury cannot be compelled to answer them. A failure to answer or find any affirmative fact essential to sustain the verdict will have the force and effect to nullify the verdict and result in a mistrial.

What then was the issue in this case? Evidently the question was, who received the greater number of legal votes. It was conceded that according to the official returns the respondent had a majority of one. The burthen of overcoming this was upon the relator. He undertook to do this by showing that certain votes cast in favor of the respondent were illegal, and in this way reduce the number of legal votes which he received. The respondent undertook to show that certain illegal votes were cast in favor of the relator, for the purpose of establishing the fact, that notwithstanding the illegal votes, if any, which he received, yet by deducting the illegal votes given the relator, he, the respondent, would still have a majority. The parties therefore had a right to have certain questions submitted to the jury for the purpose of ascertaining whether certain alleged illegal voters voted at said election, for whom they voted, and whether they were legally entitled to vote.

In the light of what has been said, we will now examine some of the questions raised in this case.

The third, fourth, fifth, sixth, sixteenth, twenty-eighth

and twenty-ninth questions proposed by the respondent should have been submitted to the jury. The third, fourth, fifth and sixth questions may be considered together. These questions were proposed for the purpose of having the jury say whether certain persons illegally voted for the relator as the evidence given tended to show. It is claimed, however, that as to the third, fourth and fifth questions, there was no evidence tending to show that the persons referred to therein voted for the relator, and therefore the court properly refused to submit these questions. The record in reference to this question was as follows:

"The testimony aforesaid, tending to show that two men voted for the relator in the second precinct of the tenth ward, was substantially as follows:

"One of the inspectors of election in that precinct testified that two men voted for the relator, whose names are not found registered as voters; that he did not know their names, but believed the name of one of the men was Moran, and that he saw the ballots as they were handed by the voters to the other inspector, and was confident they were straight democratic tickets. The poll list for that precinct was produced, and the name of D. Moran appeared as having voted at that election. His name did not appear on the registry. This was all the evidence in respect to these votes."

We are referred to the case of *The People v. Cicott, 16 Mich., 312–313,* in support of the position of relator's counsel. We are satisfied with what was there said, and have no intention or desire of departing from it. But it does not appear in this case that the inspector who testified had no other knowledge of how the parties voted except from the appearance of a folded ticket. He testified he was *confident* they were straight democratic tickets, and it is conceded relator's name was upon the straight democratic ticket. How the witness acquired his confidence, does not appear. We cannot, nor could a jury, assume it was from the appearance of the ballot only. The evidence in this form was

competent and admissible; and if the relator's counsel did not consider it necessary to inquire further concerning the source of this witness' information, they ought not now to complain.—*Bissell v. Starr, 32 Mich., 297.*

As to the sixth question, it is said relator's counsel upon the trial admitted the two persons there inquired about illegally voted for the relator, and therefore there was no necessity for submitting the question to the jury. We are not satisfied that this position is correct. The fact having been admitted would have relieved the jury from all difficulty in answering the question, but as it was the duty of the jury to find from the evidence and admissions the entire number of illegal votes cast for the relator, the respondent had the right to have the jury pass upon and answer the question notwithstanding the admission.

It was claimed by the relator that Robert McClatchey voted for respondent, although he was not legally entitled to vote in the city of Detroit, not being a resident thereof. The sixteenth proposed question, viz.: "Was he, McClatchey, duly registered in said third ward at the time of said election?" was material, because, if duly registered, then he was *prima facie* entitled to vote. This question we will consider farther when we come to the instructions given the jury as to McClatchey's residence and right to vote.

There was another objection urged against the form of this question, which was also urged against the twenty-eighth question, "Was he, William Bruce, a legal voter?" and the twenty-ninth, "If not, why not?" viz.: that to ask whether a party was "duly registered," or was a "legal voter," was asking the jury to pass upon a question of law, and to give their reasons for coming to the conclusion. It is true an answer to the sixteenth and twenty-eighth questions involve the application by the jury of legal principles to the evidence in the case, and a conclusion therefrom; but it does not thereby follow that the questions are improper, or that the jury could not answer them.

The legality or illegality of certain votes was the very

33 MICH.—32.

question which the jury was empanelled to decide. To enable them to do this, evidence was submitted to them, the court was to give them the law applicable thereto, and from the law and the evidence thus submitted they were to find the fact. In finding a verdict for the relator, they must have found that certain persons who voted for the respondent were "illegal voters," in order to overcome the majority with which he started. Now if they were competent to do this, in order to find a general verdict, we fail to see why they were any less competent to find the same fact in answer to a question. If the jury were incompetent to answer such a question, then they were for the same reason incompetent to find a general verdict, but should have found the facts only, and left it to the court to have applied the law thereto and render judgment accordingly. This has not been contended. Nor was there any objection to asking the jury, in case they found Bruce was not a legal voter, to give their reasons for such a conclusion, so that the court as matter of law might determine the sufficiency of the same. If Bruce was registered and voted, the presumption follows that he was a legal voter, and facts sufficient to overcome this presumption must have been found by the jury in order to throw out his vote.

The other questions proposed, and not submitted to the jury, were inconclusive, and no matter how answered would not have been inconsistent with the verdict, and were properly withheld from the jury.

The wisdom of thus permitting questions to be submitted to the jury was assailed, but as that is a matter to be addressed to the legislative, and not the judicial department, we may pass it without comment.

Evidence was given tending to prove that Nicholas Tisler voted twice by mistake; that immediately after depositing the first ballot he called the inspectors' attention to the fact that he voted by mistake, having recently removed from that precinct, and at his request his ballot was withdrawn and canceled. The jury found that he voted twice for the

relator, and that his first ballot, or one just like it, was after-- wards withdrawn from the ballot box, and destroyed by the inspectors, and not included in their return. And it is claimed that this cured the error of his voting twice, so that the second vote should be permitted to stand.

The statute requires both ballots to be destroyed where they are so folded together as to present the appearance of a single ballot, thus depriving the person of any vote, and this irrespective of the fact whether they were folded together by mistake or intentionally. It is very apparent that should the course adopted in respect to Tisler's vote be approved, it would open the door to the grossest frauds. The inspectors are not permitted to examine the ballots as handed to them, so that where they are folded they have no means of ascer- taining how a person votes, and after the ballot is once deposited they have neither the opportunity nor authority to investigate the matter, and if they should act they would be entirely dependent upon the statement of the voter. If therefore a person should vote against the relator, and after his ballot was deposited in the box, claim he had voted in that precinct by mistake, and ask to have his ballot destroyed, asserting that he had voted for the relator, and not against him, and a ballot with the relator's name thereon should thereupon be withdrawn and canceled, the effect would be equivalent to two votes against him. An election likely to be closely contested could in this way be very materially affected. Tisler having once voted, whether legally or not, had no right to vote again, and his second vote should not be counted.

It appeared that Robert McClatchey voted in the third ward, and that his name appeared upon the register and poll list. He was therefore *prima facie* a legally qualified voter and entitled to vote in the precinct and ward where he was registered. This presumption covers and includes everything necessary to make him a qualified voter. Resi- dence in Detroit the necessary time is one of the essential requisites to a right to vote. The presumption covers this, and the burthen of proving such facts as would show that

HARBAUGH v. CICOTT.

he never was a resident of Detroit, or that if he ever was he had lost his residence, was upon the party asserting the contrary.    There was no evidence given tending to show that he never had been a resident of Detroit; but evidence was given tending to show rather that he had lost such residence.    There was evidence given tending to prove, and the court instructed the jury, "that if they should find that Robert McClatchey's family resided at the time of said election at Royal Oak, and had resided there for some years previous, and that he was in the habit of going there Saturday night and spending Sundays with them, though himself employed and living in Detroit during the week, he was not entitled to vote in Detroit."

The trouble with this charge is that it ignores entirely the question of the elector's intention in taking up or fixing his residence.    Yet the intention of the party is one of the most important inquiries involved in such a question.    No one will contend that a party loses his residence and rights as an elector because himself and family temporarily reside in some other city, township or ward, even although such temporary residence should extend over a series of years. The intention of the party, coupled with certain other facts, is what governs.

The jury, in answer to the forty-second and forty-third questions, say they don't know how many illegal votes were cast for either Mr. Cicott or Mr. Harbaugh.    The bill of exceptions shows that the question as to the number of illegal votes cast for the respective parties was the one presented to the jury and upon which they were asked to find.    If they were unable to agree upon and answer these questions, the effect would be a mistrial.    The official majority of the respondent could only be overcome by a finding of the jury showing the number of illegal votes which each party received, upon such a state of facts as existed in this case.

The judgment must be reversed, with costs, and a new trial granted.

The other Justices concurred.