PEOPLE v RAMSEY

PEOPLE v BOYD

Docket Nos. 67269, 68636. Argued December 6, 1983 (Calendar Nos. 4, 5).—Decided September 17, 1985. Rehearing denied in *Ramsey,* 424 Mich 1201. Rehearing denied in *Boyd,* 424 Mich 1202.

Bruce Ramsey was found guilty but mentally ill of second-degree murder following a bench trial in the Wayne Circuit Court, Peter B. Spivak, J. Prior to trial, the defendant's motion that the verdict of guilty but mentally ill be held unconstitutional and that the jury not be instructed with respect to that verdict was denied. Thereafter, the defendant waived his right to a jury trial. The Court of Appeals, ALLEN, P.J., and R. B. BURNS and N. J. KAUFMAN, JJ., remanded the case to the trial court for further findings of fact (Docket No. 77-3680). After remand, the Court of Appeals affirmed in an unpublished opinion per curiam. The defendant appeals, arguing that the danger of compromise by the jury because of the existence of the guilty but mentally ill verdict caused him to waive his right to a trial by jury and thus was an unconstitutional burden on the right and that the trial court's findings that he was mentally ill, yet possessed the requisite intent to support a conviction of second-degree murder, were legally and factually inconsistent.

Gary Boyd was found guilty but mentally ill by a jury in the Detroit Recorder's Court, Michael F. Sapala, J., of armed robbery and assault with intent to commit robbery while armed. The Court of Appeals, CYNAR, P.J., and V. J. BRENNAN and DEMING, JJ., affirmed in an unpublished opinion per curiam (Docket No. 50542). The defendant appeals, contending

REFERENCES FOR POINTS IN HEADNOTES

[1-7] Am Jur 2d, Criminal Law § 129 *et seq.*

Modern status of rules as to burden and sufficiency of proof of mental irresponsibility in criminal case. 17 ALR3d 146.

[4] Am Jur 2d, Homicide §§ 114, 115.

Modern status of test of criminal responsibility—state cases. 9 ALR4th 526.

[5] Am Jur 2d, Trial § 738 *et seq.*

Mental or emotional condition as diminishing responsibility for crime. 22 ALR3d 1228.

that the submission of the guilty but mentally ill verdict to the jury encouraged it to return the verdict as a compromise between the verdict of guilty and the verdict of not guilty by reason of insanity.

In an opinion by Justice BRICKLEY, joined by Chief Justice WILLIAMS and Justice RYAN, and an opinion by Justice BOYLE, the Supreme Court *held:*

The distinction drawn by the Legislature between mental illness and insanity was not confused by the creation of the guilty but mentally ill verdict. The distinction, when considered in the light of the verdict of guilty but mentally ill combined with the verdicts of guilty, not guilty, and not guilty by reason of insanity remains clear and does not deny a defendant the right to a fair trial.

1. A defendant who raises an insanity defense may be found guilty but mentally ill if the trier of fact finds beyond a reasonable doubt that the defendant is guilty of an offense and was mentally ill but was not legally insane at the time the offense was committed. A person is legally insane if, as a result of mental illness, he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law. Mental illness is a substantial disorder of thought or mood which significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life.

2. In creating the guilty but mentally ill verdict, the Legislature created a clear distinction between mental illness and insanity. Any confusion created by the verdict is within a jury's competence to comprehend. The distinction does not result in a denial of the right to a fair trial. Nor does the availability of the verdict infringe upon the right to a fair trial by creating an unjustifiable risk of the jury's reaching a compromise verdict. The possibility of compromise is present in every case. All members of a criminal jury are required to agree beyond a reasonable doubt to the same verdict. There is no prohibition against a juror changing positions during deliberations. Reversal is required where the jurors foresake their convictions simply to reach a compromise verdict that is not legally or factually supportable because the defendant would not have been found guilty beyond a reasonable doubt by all members of the jury. Parties who are concerned that a jury has compromised are free to poll the jury.

3. Evidence concerning a defendant's mental condition is admissible to show whether the defendant had the requisite intent to support a conviction of the crime charged. A finding

of mental illness, even when defined as a substantial disorder of thought or mood, does not inexorably lead to the conclusion that the defendant did not entertain the requisite intent. In a prosecution of first-degree murder, a finding of mental illness does not negate malice aforethought as a matter of law.

4. In *Ramsey,* the trial court, sitting as the trier of fact, found that the defendant entertained the malice aforethought necessary to support a conviction of second-degree murder. It was not necessary that the court additionally state affirmatively that all potential mitigating factors, including the defendant's mental illness, had been considered and rejected. In *Boyd,* the defendant's claim that instruction of the jury, over his objection, on the possible dispositions of a defendant found guilty but mentally ill and a defendant found not guilty by reason of insanity was error and that his assertion of error should not have been rejected by the Court of Appeals in light of *People v Goad,* 421 Mich 20 (1984), does not require reversal because the holding in *Goad* was expressly stated to be prospective and thus inapplicable to *Boyd.*

Justice BOYLE, concurring, stated that it is not error to instruct the jury as to the disposition of a defendant found guilty but mentally ill. It is just as wrong and erroneous to mislead a jury into believing there is no public safety factor in a verdict of guilty but mentally ill because a defendant will not be released until it is certain that he will not commit further violent crime as it is to mislead a jury into believing a defendant will automatically be released from a mental hospital within a very short time if such a verdict is returned. The best way to combat efforts by the defense and the prosecution to persuade the jury to accept their respective versions of the defendant's disposition is to instruct the jury on what the law provides. Confidence in the jury should override the fear that somehow knowledge of what happens to a defendant when a verdict of guilty but mentally ill is returned will result in an unjust verdict.

*Ramsey,* affirmed.

*Boyd,* affirmed.

Justice LEVIN, joined by Justice CAVANAGH, dissenting, would hold the guilty but mentally ill verdict to be unconstitutional because a jury cannot, consistent with an accused's right to a trial by jury, be called upon to provide a special finding explicating a guilty or not guilty verdict. The form of the special finding called for by the statute establishing the guilty but mentally ill verdict, the jury instructions contemplated by the statute, and the instructions given in *Boyd* are violative of

due process because they focus the jury's deliberations and verdict on a finding that is not determinative of the central issue of guilt or innocence, thereby impermissibly impairing the accused's right to a fair trial and to be presumed innocent. Unlike verdicts of not guilty by reason of insanity, the special finding of mental illness required where the defendant is found guilty but mentally ill does not affect the finding of criminal responsibility, the sentence that may be imposed, or any treatment that the defendant may receive.

Justice RILEY took no part in the decision of this case.

OPINION BY BRICKLEY, J.

1. CRIMINAL LAW — INSANITY — MENTAL ILLNESS — GUILTY BUT MENTALLY ILL.

A defendant who raises an insanity defense may be found guilty but mentally ill if the trier of fact finds beyond a reasonable doubt that the defendant is guilty of an offense and was mentally ill but was not legally insane at the time the offense was committed; a person is legally insane if, as a result of mental illness, he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law; mental illness is a substantial disorder of thought or mood which significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life (MCL 330.1400a, 768.21a, 768.36[1]; MSA 14.800[400a], 28.1044[1], 28.1059[1]).

2. CRIMINAL LAW — INSANITY — MENTAL ILLNESS — GUILTY BUT MENTALLY ILL.

The distinction drawn by the Legislature between mental illness and insanity was not confused by the creation of the guilty but mentally ill verdict; the distinction, when considered in the light of the verdict of guilty but mentally ill combined with the verdicts of guilty, not guilty, and not guilty by reason of insanity, remains clear and does not deny a defendant the right to a fair trial (MCL 330.1400a, 768.21a, 768.36[1]; MSA 14.800[400a], 28.1044[1], 28.1059[1]).

3. CRIMINAL LAW — FAIR TRIAL — GUILTY BUT MENTALLY ILL — COMPROMISE VERDICTS.

The availability of the verdict of guilty but mentally ill does not infringe upon the right to a fair trial by creating an unjustifiable risk of the jury's reaching a compromise verdict; the possibility of compromise is present in every case; reversal is required where the compromise is not legally and factually supportable and results in a failure of all members of a jury to

find a defendant guilty beyond a reasonable doubt (MCL 768.36[1]; MSA 28.1059[1]).

4. HOMICIDE — FIRST-DEGREE MURDER — MENTAL ILLNESS — REQUISITE INTENT.

Evidence concerning a defendant's mental condition is admissible to show whether the defendant had the requisite intent to support a conviction of the crime charged; a finding of mental illness, even when defined as a substantial disorder of thought or mood, does not inexorably lead to the conclusion that the defendant did not entertain the requisite intent; in a prosecution of first-degree murder, a finding of mental illness does not negate malice aforethought as a matter of law (MCL 750.316; MSA 28.548).

CONCURRING OPINION BY BOYLE, J.

5. CRIMINAL LAW — JURY INSTRUCTIONS — GUILTY BUT MENTALLY ILL — DISPOSITION OF DEFENDANT.

*It is not error to instruct the jury as to the disposition of a defendant found guilty but mentally ill; it is just as wrong and erroneous to mislead a jury into believing there is no public safety factor in returning such a verdict because a defendant will not be released until it is certain that he will not commit further violent crime as it is to mislead a jury into believing a defendant will automatically be released from a mental hospital within a very short time after the verdict is returned; such instruction is the best way to combat efforts by the prosecution and the defense to persuade the jury to accept their respective versions of disposition.*

DISSENTING OPINION BY LEVIN, J.

6. CRIMINAL LAW — INSANITY — MENTAL ILLNESS — GUILTY BUT MENTALLY ILL.

*The guilty but mentally ill verdict infringes on the constitutional right of an accused to a trial by jury by requiring the jury to make a special finding of mental illness in partial explication of its general verdict of guilty (MCL 768.36; MSA 28.1059).*

7. CRIMINAL LAW — INSANITY — MENTAL ILLNESS — GUILTY BUT MENTALLY ILL.

*The finding that a defendant was mentally ill at the time of the commission of a crime has no effect on the finding of criminal responsibility, the sentence that may be imposed, or any treatment that the defendant may receive (MCL 768.36; MSA 28.1059).*

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *John D. O'Hair,* Prosecuting Attorney, *Edward Reilly Wilson,* Deputy Chief, Civil and Appeals, and *Timothy A. Baughman,* Principal Attorney, Research, Training and Appeals, for the people in *Ramsey* and *Boyd.*

State Appellate Defender (by *Norris J. Thomas,* Chief Deputy Defender and *Rolf E. Berg,* Assistant Defender) and *Lauck, Leto & Cavanaugh, P.C.* (by *Frederick W. Lauck*), for defendant Ramsey.

State Appellate Defender (by *Rolf E. Berg*) for defendant Boyd.

Amici Curiae:

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Michael A. Nickerson,* Assistant Attorney General, for the Attorney General.

*Arthur J. Tarnow* and *Mark Granzotto* for Michigan Psychiatric Society.

*John F. Salan* for Prosecuting Attorneys Association of Michigan.

BRICKLEY, J. These cases involve the constitutionality of MCL 768.36; MSA 28.1059, the statute which introduced the verdict of guilty but mentally ill to this state. In both cases, it is asserted that the guilty but mentally ill verdict violates principles of due process of law. We hold the statute to be constitutional.

## I

Defendant Bruce Ramsey was charged with first-degree murder, MCL 750.316; MSA 28.548, as a

result of the death of his wife. Ramsey had first choked her, and then stabbed her thirty-two times. At trial, he raised the defense of insanity, claiming he believed that he was exorcising a demon from his wife by stabbing her and that she would return to life once the demon was removed.

In the trial court, defendant moved that the verdict of guilty but mentally ill be held unconstitutional and that the jury not be instructed on that verdict. According to defendant, he opted for a bench trial because his motion was denied.

Several witnesses, including Ramsey himself, testified in support of his claim of insanity. Defendant was portrayed as the product of a Southern fundamentalist religious family who had strayed from the church by drinking alcohol, smoking marijuana, and having an extra-marital affair.

A few months before the killing, Ramsey visited his mother in Kentucky. She gave him a pamphlet entitled "Defeated Enemies," which concerned demons and demon-possessed people. Both Ramsey and a woman by the name of Cross testified that that weekend, Ramsey, while engaged in sexual intercourse with Cross, suffered a psychotic episode; Ramsey thought that Cross was a devil. Ramsey fled the room. When later found by Cross, Ramsey insisted that they return to their room to pray, which they did.

Ramsey testified regarding an episode the day before the killing. He found in the clogged choke of his truck a sign from God that he should stay with his wife. He also found messages from God in the lyrics of popular songs.

The day of the killing, Ramsey, after a full day of work, called his mother in Kentucky. He was excited; his mother described him as exuberant over his "return to God."

As for the killing itself, which was witnessed by

Ramsey's children, who testified at trial, the victim and Ramsey had apparently argued. One of Ramsey's children testified that the victim came to the child's room crying. Ramsey entered the room and said, "Walk." The victim left the room and locked herself in the bathroom. Ramsey broke down the bathroom door.

Ramsey testified that he had attempted to choke, and then to stab, the demon out of his wife. Ramsey's son testified that he heard Ramsey say, "Die demon, die." When Ramsey realized that the victim was dead and was not returning to life, he placed her body in bed, crawled in next to her, and stabbed himself in the chest. Found in that position by the police (the children had fled to a neighbor's home), Ramsey was taken to a hospital. There, he made statements to family and friends to the effect that he was "screwed up" and that his wife "wasn't supposed to die." Hospital psychiatrists diagnosed Ramsey as acutely psychotic upon admission.

Psychiatrists called by the prosecution and the defense differed over whether Ramsey was mentally ill or insane at the time of the killing. Dr. Emanuel Tanay testified for the defense that Ramsey was acutely psychotic and legally insane at the time of the killing. A lengthy taped interview between Ramsey and Dr. Tanay was played to the court. Dr. Philip Margolis, however, testified for the prosecution that Ramsey was neither mentally ill nor insane at the time of the crime. Dr. Margolis stated that Ramsey's behavior, rationalizing the killing after it had taken place, was consistent with an attempt to escape responsibility for the crime.

Dr. Irving Edgar, also testifying for the prosecution, initially testified that Ramsey was not psychotic at the time of the killing and that it was

possible that the demon story was fabricated. On cross-examination, however, Dr. Edgar testified that he was not sure if Ramsey knew right from wrong when he was choking his wife and that Ramsey was probably psychotic following the choking.

The trial court found Ramsey guilty of the crime of second-degree murder, but mentally ill. Following a remand to the trial court for further factual findings, 89 Mich App 468; 280 NW2d 565 (1979), the Court of Appeals affirmed Ramsey's conviction by way of an unpublished opinion per curiam. This Court granted Ramsey's application for leave to appeal. 414 Mich 864 (1982).

Defendant Gary Boyd was charged with armed robbery, MCL 750.529; MSA 28.797, and assault with intent to commit robbery while armed, MCL 750.89; MSA 28.284, for conduct at the home of his former girlfriend. Boyd, after being admitted to the home of Ruby Hughes, suddenly and without provocation grabbed her around the neck, held a knife to her throat, and demanded money. He led Hughes upstairs and assaulted two other women, robbing one of the other women of a few dollars. Boyd then dropped his knife and fled after stating that he knew that Hughes was going to shoot him in the back.

At trial, Boyd did not dispute that the events occurred. He presented an insanity defense. He related an extensive psychiatric history, including several hospitalizations, with one hospitalization exceeding eighteen months. Regarding the events of the crime, Boyd testified, "I don't know. One minute we was talking and the next minute, before I know it, I had a knife around her side."

Boyd presented three witnesses as to his mental state. Dr. Bruce Danto, a psychiatrist, testified that defendant was schizophrenic, psychotic, and

insane at the time of the crime. Boyd's mother and his sister testified to the effect that Boyd had been exhibiting strange behavior patterns for years and that he was alternately violent and paranoic, a compulsive gambler, and would sometimes see and hear nonexistent things.

Dr. Steven Bank, a psychologist, testified for the prosecution that Boyd was mentally ill, but not insane. He noted that defendant had denied that the crime had occurred when he was arrested. This denial, according to Dr. Bank, indicated a purposeful behavior inconsistent with insanity. He further testified that defendant had described himself as a "good con-man."

The jury returned a verdict of guilty but mentally ill to both charged counts and the Court of Appeals affirmed Boyd's convictions in an unpublished opinion per curiam. This Court granted Boyd's application for leave to appeal. 415 Mich 851 (1982).

## II

Both Ramsey and Boyd contend that the guilty but mentally ill verdict denied them the due process of law guaranteed by the Fourteenth Amendment to the United States Constitution. Their arguments, however, are subtly different. Ramsey argues that the danger of jury compromise due to the existence of the guilty but mentally ill verdict caused him to waive his right to a jury trial, and, therefore, he should be allowed to challenge the constitutionality of the verdict. Boyd's argument is more straightforward. He contends that the submission of the guilty but mentally ill verdict to the jury encouraged the jury to return that verdict as a compromise between the verdict of guilty and the verdict of not guilty by reason of insanity. We

will treat the arguments of both defendants jointly.

A fair trial is a right guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Drope v Missouri,* 420 US 162; 95 S Ct 896; 43 L Ed 2d 103 (1975). Therefore, our task is to decide if the guilty but mentally ill verdict violates principles of fairness by, according to defendants, deflecting a jury's attention from the issues of guilt or innocence by adding an irrelevant verdict which brings the risk of impermissible jury compromise.[1] We must stress, however, that we are not concerned with the wisdom of the verdict. Arguments that a statute is unwise or results in bad policy should be addressed to the Legislature. Our concern here is only whether the statute is invalid because it denies criminal defendants a fair trial.[2]

MCL 768.36(1); MSA 28.1059(1) provides:

> If the defendant asserts a defense of insanity in compliance with section 20a [MCL 768.20a; MSA 28.1043(1)], the defendant may be found "guilty but mentally ill" if, after trial, the trier of fact finds all of the following beyond a reasonable doubt:
> (a) That the defendant is guilty of an offense.

---

[1] Amicus curiae Michigan Psychiatric Society, branch of American Psychiatric Society, also contends that the guilty but mentally ill verdict is unconstitutional because it creates an irrational distinction. The society contends that, in psychiatric terms, the definitions of mental illness and insanity are identical. We note that claim was contradicted by the testimony of psychologist Dr. Steven Bank in *Boyd,* who found Boyd mentally ill but not insane. In any event, it is not the custom of this Court to decide constitutional issues raised by amici, but not the parties, and we express no opinion on the matter.

[2] Ramsey also contends that we must review this case to determine if the Legislature used the least intrusive means to accomplish its purpose, citing *Dunn v Blumstein,* 405 US 330; 92 S Ct 995; 31 L Ed 2d 274 (1972), an equal protection case. We do not find that standard applicable to the due process challenge made here.

(b) That the defendant was mentally ill at the time of the commission of that offense.

(c) That the defendant was not legally insane at the time of the commission of that offense.

MCL 768.21a; MSA 28.1044(1) defines insanity:

A person is legally insane if, as a result of mental illness . . . that person lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

Finally, mental illness is defined in MCL 330.1400a; MSA 14.800(400a) as:

[A] substantial disorder of thought or mood which significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life.

The history of the guilty but mentally ill verdict is well set forth in Smith & Hall, *Evaluating Michigan's guilty but mentally ill verdict: An empirical study,* 16 U Mich J L Ref 77 (1982). For our purposes here, it suffices to state that the statute was a reaction to this Court's decision in *People v McQuillan,* 392 Mich 511; 221 NW2d 569 (1974). Following that decision, a large number of persons found not guilty by reason of insanity, whom professionals had determined to be presently sane, were released from institutions, with tragic results. Two of the released persons soon committed violent crimes. See Comment, *Guilty but mentally ill: An historical and constitutional analysis,* 53 U Det J Urban L 471, 471-472 (1976); Robey, *Guilty but mentally ill,* 6 Bull of Am Ass'n of Psychiatry 374-375. Amid public outcry, the Legislature responded with the guilty but mentally ill verdict.

The major purpose in creating the guilty but mentally ill verdict is obvious. It was to limit the number of persons who, in the eyes of the Legislature, were *improperly* being relieved of all criminal responsibility by way of the insanity verdict. As stated in the House analysis of the bill creating the verdict, one argument in favor of the verdict was that:

> The new verdict will help a jury. Perhaps because there seems to be a tendency for people to assume that someone who commits a particularly offensive crime "must be insane," juries frequently find defendants in such cases "not guilty by reason of insanity." Sometimes, however, the defendants are not legally insane, and although it may well have been the intent of the jury that such defendants be committed for a long period, they must be automatically released under a Michigan Supreme Court ruling of September, 1974. [Third Analysis of HB 4363, Michigan House Legislative Analysis Section (July 15, 1975).]

There is nothing impermissible about such a purpose. It is well within the power of the Legislature to attempt to cure what it sees to be a misuse of the law.[3] What we must decide, however, is whether the verdict acts to deny defendants a fair trial.

---

[3] A study by the Center for Forensic Psychiatry in September of 1974 indicated that of some 350 persons found not guilty by reason of insanity only twenty percent of them suffered from mental illness sufficient to exculpate their actions. Thirty percent of those persons were found to have no mental illness whatsoever. The remaining fifty percent were viewed as having some psychosis or neurosis, but with no evident relationship between their mental state and their crime. Robey, *supra*. Of course, a verdict of not guilty by reason of insanity determines a defendant's mental state at the time of the crime, not afterwards. Still, in view of these statistics and the number of persons released after *McQuillan*, and unless treatment of the mentally ill has progressed far beyond the level of which we are aware, one can hardly conclude that the Legislature was irrational in finding the insanity verdict to have been misused.

It is claimed that the guilty but mentally ill verdict introduces a confusing irrelevancy into jury deliberations. Therefore, the first question we must face is whether the inclusion of the guilty but mentally ill verdict is so confusing to the jury that it denies a defendant a fair trial.

To a certain extent, we must agree that the inclusion of the verdict complicates a trial and creates a greater opportunity for confusion. Under prior law, the jury had only to decide whether the defendant was sane. Under present law, the jury must engage in a two-step inquiry. But the fact that an extra step is added to the inquiry hardly makes the inquiry beyond a jury's competence.

Furthermore, we reject the claim that a jury is unable to comprehend the distinctions made by the Legislature between the concepts of mental illness and insanity. Our statutory scheme recognizes a continuum of mental functioning. A person is mentally ill if suffering from "a substantial disorder of thought or mood which significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life." MCL 330.1400a; MSA 14.800(400a). A person is insane, however, only if that substantial impairment results in the lack of "substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law." MCL 768.21a; MSA 28.1044(1). Under these definitions, one must be mentally ill before he can be found insane, but the converse is not true. As stated by Justice CAVANAGH in *People v Fultz,* 111 Mich App 587, 590; 314 NW2d 702 (1981):

> Insanity by definition is an extreme of mental illness. When a person's mental illness reaches · that extreme, the law provides that criminal re-

sponsibility does not attach. To put it alternatively, the statutes provide that all insane people are mentally ill but not all mentally ill people are insane.

Also, MCL 768.36(1); MSA 28.1059(1) requires the jury to find that the defendant is not insane, that is, that the defendant does not lack the substantial capacity to appreciate the wrongfulness of his conduct or the ability to conform his conduct to the law, before it can conclude that the defendant is guilty but mentally ill.

We conclude that the Legislature has created a clear distinction between mental illness and insanity. Of course, in particular cases, this distinction may be very subtle and difficult for the jury to apply. But, it is no more subtle or difficult than the distinction between the intent to do great bodily harm and the intent to kill, a distinction we allow juries to make which often determines whether a defendant is guilty of first- or second-degree murder. In short, we cannot say that the legislative distinctions between mental illness and insanity deny the right to a fair trial.

Both Ramsey and Boyd also contend that the inclusion of the guilty but mentally ill verdict infringed on their right to a fair trial by creating an unjustifiable risk of a compromise verdict.[4] We find this claim to be wholly speculative, and must reject it.

All members of a criminal jury must agree

---

[4] Ramsey and Boyd also find a verdict which does not distinguish a separate degree of criminal responsibility to be "so extraordinary that no direct analogy exists." We note that novelty does not equal unconstitutionality. Furthermore, since sanity is only presumed in a normal prosecution, and must be proved beyond a reasonable doubt by the prosecution in this state when evidence of insanity is raised, see *People v Savoie,* 419 Mich 118; 349 NW2d 139 (1984), there is a direct analogy, the verdict of not guilty by reason of insanity. See *Underwood v People,* 32 Mich 1 (1875).

beyond a reasonable doubt to the same verdict. That is not to say that individual jurors cannot change their initial view of a case and ultimately reach a common ground with the others. Provided that in the end all jurors agree beyond a reasonable doubt as to the verdict, there is absolutely no prohibition of a juror changing positions during deliberations. Juror deliberations, however, must be distinguished from juror compromise. When jurors give up their beliefs to settle on a common ground with other jurors, who may have also abandoned their convictions in the interest of agreement, a compromise verdict results. When jurors forsake their convictions simply to reach a verdict, the defendant has not been found guilty beyond a reasonable doubt by all members of the jury.

In *People v Stahl,* 234 Mich 569; 208 NW 685 (1926), *People v Gessinger,* 238 Mich 625; 214 NW 184 (1927), and *People v Vail,* 393 Mich 460; 227 NW2d 535 (1975), we recognized that jurors, as people generally, often will compromise with regard to their differences. In those cases, we recognized a fact, consistent with human nature. In each of those cases, however, the issue was not whether the jury had, in fact, compromised. Instead, the issue was whether allowing a greater charge not supported by the evidence to go to the jury constituted error requiring reversal of the defendants' convictions, even though the defendant in each case was convicted of the lesser charge. And, it was not only the possibility of impermissible compromises which led this Court to conclude that reversal was required, but also the possibility that all jurors could be equally swayed by the inclusion in their deliberations of a greater, but legally improper, charge. The point of those cases, however, is not that the possibility of jury compro-

mise requires a conviction to be reversed. That possibility is present in every case. To the contrary, our decisions were based on the reality that compromise does occur, and, therefore, the boundaries within which it occurs must be legally and factually supportable.

The problem raised in *Stahl, Gessinger,* and *Vail* is not present in the present case. Jurors had not begun their discussions considering charges of which the defendants could not have been convicted as a matter of law. Exactly how the jurors in *Boyd* reached their decision, or how the typical jury would act in the case of *Ramsey,* is entirely a matter of speculation.

Parties who are concerned that the jury has compromised are free to poll that jury pursuant to MCR 2.512(B)(2). See also *People v Pizzino,* 313 Mich 97; 20 NW2d 824 (1945). Since there is no other error identified in the present cases which, in light of the possibility of compromise, could have prejudiced defendants, we must reject their claims.[5] See *Illinois v DeWit,* 123 Ill App 723; 463 NE2d 742 (1984), which also rejected the argument that the possibility of a compromise violates due process. To hold otherwise would require us to presume a jury compromise in every case where more than one verdict or charge is submitted to the jury.

[5] Nor do available statistics support the claim that jury compromise is actually occurring. Prior to the adoption of the guilty but mentally ill verdict, 0.024 percent of adult males arrested were found not guilty by reason of insanity. In 1982, 0.032 percent of adult males arrested were found not guilty by reason of insanity. Smith & Hall, *supra,* p 101. These statistics, while not only hopeful, can be interpreted to mean that the guilty but mentally ill verdict, having not decreased insanity verdicts, has been ineffectual and, perhaps, irrelevant. One could also interpret these statistics to mean that the guilty but mentally ill verdict has been very effective in avoiding improper insanity verdicts, as evidenced by the almost insignificant rise in the percentage of such verdicts. In any event, there is no real empirical support for the claim that juries have compromised what should be insanity verdicts by returning verdicts of guilty but mentally ill.

### III

Ramsey raises two additional issues regarding the guilty but mentally ill verdict.[6] First, he argues that as a matter of policy this Court should hold that a mentally ill defendant cannot entertain the malice necessary to support a murder conviction. Alternatively, he argues that we should find that a trial court must, in its findings of fact following a bench trial, affirmatively state that the mental illness did not negate the necessary intent for second-degree murder.

Malice aforethought, or stated otherwise, the mental state necessary for the crime of murder, requires the intent to kill, the intent to do great bodily harm, and the intentional creation of a great risk of death or great bodily harm with the knowledge that death is the probable result. *People v Aaron,* 409 Mich 672; 299 NW2d 304 (1980). A finding of mental illness, even when defined as a substantial disorder of thought or mood, does not inexorably lead to the conclusion that the defendant did not entertain the requisite malice aforethought for murder. As explained in LaFave & Scott, Criminal Law, § 42, p 326:

A defendant in a criminal case, at the time he

---

[6] Ramsey also raises two issues which do not, strictly speaking, deal with the guilty but mentally ill verdict. We find neither argument persuasive. First, he claims that the prosecution introduced insufficient evidence of his sanity. The prosecution responds with a request that the case relied on by defendant, *People v Murphy,* 416 Mich 453; 331 NW2d 152 (1982), should be overruled. We decline to now consider that request. Expert witnesses testified for both the prosecution and the defense. Even though the prosecution's experts were subjected to an unusually strong cross-examination by defendant, we cannot say that their testimony, viewed in the light most favorable to the prosecution, was insufficient evidence that Ramsey was sane, even under *Murphy.*

Ramsey's remaining issue was not brought to the attention of the trial court or the Court of Appeals, and we will not consider it for the first time now.

engaged in the conduct giving rise to the charges against him, may have been suffering from an abnormal mental condition which was not of a kind or character to afford him a successful insanity defense under the right-wrong test or other standard applicable in that jurisdiction. But, while this defendant is therefore ineligible for a finding of not guilty by reason of insanity, his mental abnormality may nonetheless be a most relevant consideration in the determination of whether he is guilty of the crime charged. Under the doctrine referred to as partial responsibility, diminished responsibility, or (somewhat less accurately) partial insanity, evidence concerning the defendant's mental condition is admissible on the question of whether the defendant had the mental state which is an element of the offense with which he is charged.

Thus, while his mental illness may be a consideration in evaluating the requisite state of mind for the crime charged, we decline to accept Ramsey's invitation to hold that a finding of mental illness negates malice aforethought as a matter of law.[7]

The trial court in this case found that *Ramsey* entertained the malice aforethought necessary to support a conviction of second-degree murder. Defendant would have us require that the trial judge affirmatively state that the mental illness did not affect the defendant's ability to form the requisite intent.

Had the trial judge indicated a refusal to consider the defendant's mental illness as a diminishing factor in his decision of whether defendant

[7] Of course, if we were to hold that mental illness negates malice aforethought as a matter of law, a jury would have to be instructed that if they found the defendant mentally ill they could not find him guilty of murder. Considering the history of the guilty but mentally ill verdict, we doubt that such a result would comport with the intent of the Legislature.

possessed the requisite malice aforethought, we would find it necessary to address the question of the extent to which mental illness could diminish the intent requirement for second-degree murder. But he did not. We therefore are faced with a statement by the judge that defendant possessed the requisite intent.

We are disinclined, under the circumstances of this case, to place a further burden on the fact-finding of a judge in a bench trial which would require, in addition to a finding of guilt on the elements of the crime, an affirmative statement that all potential mitigating factors have been considered and rejected.

Boyd raises one matter which requires additional consideration.[8] He claims that error which requires reversal occurred when the trial court, over objection, instructed the jury on the disposition of a defendant found not guilty by reason of insanity and on the disposition of a defendant found guilty but mentally ill. The Court of Appeals rejected Boyd's claim on the strength of authorities now questionable in light of our recent decision in *People v Goad,* 421 Mich 20; 364 NW2d 584 (1984).

In *Goad,* we held that it was error to instruct the jury as to the disposition of a defendant found not guilty by reason of insanity. However, we expressly stated that our holding was prospective, which makes it inapplicable to *Boyd.* As to the propriety of giving instructions on the disposition of a defendant found guilty but mentally ill (CJI 7:8:01), *Goad, supra,* p 37, strongly intimated that such instructions are also improper:

---

[8] Boyd also finds error in the trial court's failure to reopen the proofs *sua sponte.* We find no clear error in the conclusion of the Court of Appeals that the trial court did not err.

We hold that in all jury instructions given more than 30 days after the filing of this opinion, the jurors shall not be given any information including, but not limited to, CJI 7:8:07 and 7:8:08 requiring the disposition of the defendant after their verdict.

We would now similarly hold that jurors should not be instructed on the disposition of a defendant found guilty but mentally ill. Although error occurred in the instant case, it does not require reversal, for the reasons stated in *Goad.*

Williams, C.J., and Ryan, J., concurred with Brickley, J.

Boyle, J. (*concurring*). I concur in all respects save one with the majority opinion. For the reasons stated in dissent in *People v Goad,* 421 Mich 20, 38; 364 NW2d 584 (1984), I would hold that it is not error to instruct the jury as to the disposition of a defendant found guilty but mentally ill.

Levin, J. (*dissenting*). I would hold that the guilty but mentally ill verdict is unconstitutional because a jury cannot, consistent with the right of an accused in a criminal prosecution to a trial by jury,[1] be called upon to provide a special finding explicating a guilty or not guilty verdict.

The form of the special finding called for by the statute establishing the guilty but mentally ill verdict,[2] and the jury instructions contemplated by

---

[1] Const 1963, art 1, § 20. Similarly, see US Const, Am VI, applicable to the states under US Const, Am XIV, *Duncan v Louisiana,* 391 US 145; 88 S Ct 1444; 20 L Ed 2d 491 (1968).

[2] "If the defendant asserts a defense of insanity . . . the defendant may be found 'guilty but mentally ill' if, after trial, the trier of fact finds all of the following beyond a reasonable doubt:

"(a) That the defendant is guilty of an offense.

"(b) That the defendant was mentally ill at the time of the commission of that offense.

that statute—and those actually given in the instant case of *Boyd*—are also violative of the Due Process Clause[3] because they focus the deliberations and the verdict on a finding that is not determinative of the central issue of guilt or innocence, thereby impermissibly impairing the accused's rights to a fair trial and to be presumed innocent.

Any treatment provided an offender found guilty but mentally ill is not a consequence of the special finding that, at the time the offense was committed, he was mentally ill, but rather of a determination that the offender at some time after his imprisonment is mentally ill, is treatable, and there are resources available to provide treatment, a determination made by physicians and other professionals without regard to, and uninfluenced by, the jury's special finding of mental illness.

I

Bruce Ramsey was charged with first-degree murder.[4] Before trial Ramsey filed a notice of his intention to assert a defense of insanity. Also before trial Ramsey moved that the statute,[5] providing that a defendant who asserts a defense of insanity may be found "guilty but mentally ill," be declared unconstitutional,[6] and that the jury not be instructed on that verdict. After the circuit judge denied the motion, Ramsey filed a written

"(c) That the defendant was not legally insane at the time of the commission of that offense." MCL 768.36(1); MSA 28.1059(1).

[3] Const 1963, art 1, § 17. Similarly, see US Const, Am XIV.

[4] MCL 750.316; MSA 28.548.

[5] MCL 768.36; MSA 28.1059. See n 2.

[6] Ramsey argued that the statute denies due process of law because persons found guilty but mentally ill receive grossly inadequate, if any, psychiatric care and treatment within either the Department of Corrections or the Department of Mental Health.

waiver of his right to a jury trial. The circuit judge found Ramsey guilty of second-degree murder,[7] but mentally ill.[8] The Court of Appeals, following a

---

[7] MCL 750.317; MSA 28.549.

[8] The testimony tended to show that Ramsey inflicted multiple and fatal stab wounds to his wife's face, neck, chest, and upper abdomen. The testimony of Ramsey and others also tended to show that, at the time of the stabbing, he believed his wife was possessed by a demon, that she was already dead as a result of such demon possession, and that he could bring her back to life by "[t]rying to cut the demon out of her." It appears that just before the fatal stabbing Ramsey first choked, and then struck, his wife in an attempt to exorcise the perceived demon. The testimony of Ramsey and of Ramsey's two children indicates that sometime after the choking, and perhaps while stabbing his wife, Ramsey said, "Go away, demon, go die."

It appears that after the stabbing Ramsey hugged his (then nine-year-old) son and prayed with him. Ramsey apparently then placed his wife's body in their bed and crawled in next to her body, where he fell asleep. He testified that he was awakened when state police officers knocked on his door and identified themselves, that at that point he realized that his wife was in fact dead, and that he stabbed himself in the chest and got back into bed with his wife's body so that, if he died, he could "go with her."

Ramsey was arrested and transported to a hospital. A psychiatrist who evaluated Ramsey—apparently two days later—diagnosed him as suffering from acute psychosis and acute paranoid schizophrenia.

The psychiatrist's report also indicated that Ramsey's mental status was "religious paranoid ideation and severe impairment of reality orientation and his actions following his paranoid delusions." This evaluation concerning the influence of religious beliefs and delusions is consistent with testimony establishing that (1) approximately ten weeks before the stabbing incident Ramsey's mother gave him a religious pamphlet, which she described as containing case histories of casting out demons; (2) also approximately ten weeks before the stabbing incident Ramsey, while engaging in sexual intercourse with a woman other than his wife, became convinced that the woman was a devil or demon, became frightened, quit the act of intercourse and, believing the event to be a sign from God to stop cheating on his wife, prayed together with the woman; and (3) the day before the stabbing incident Ramsey believed that God—by controlling whether the clogged choke in Ramsey's van would clear up—would help him decide whether or not to stay with his wife.

Expert testimony was received from three psychiatrists. The defense called Dr. Emanuel Tanay, who testified that Ramsey was acutely psychotic and legally insane at the time of the stabbing incident. The people called Dr. Irving Edgar and Dr. Philip Margolis. Dr. Edgar testified on direct examination that Ramsey "knew right from wrong" and "was not psychotic at the time he attacked his wife." On cross-examination, however, Dr. Edgar testified that, in view of the entire incident, Ramsey "was probably psychotic following

remand for findings of fact,[9] affirmed in an unpublished opinion.

Gary Boyd was charged with armed robbery[10] and assault with intent to commit armed robbery.[11] Before trial Boyd filed a notice of his intention to assert a defense of insanity. At trial Boyd did not deny the conduct[12] alleged in the information, but presented expert and lay testimony in support of his insanity defense.[13] The jury found Boyd guilty

the choking of his wife" and that the stabbing "was bizarre behavior and probably psychotic." Dr. Margolis testified that Ramsey was neither legally insane nor mentally ill at the time of the stabbing incident.

[9] *People v Ramsey,* 89 Mich App 468; 280 NW2d 565 (1979).

Ramsey asserted in the Court of Appeals—and continues to assert in this Court—that the circuit judge's conclusions that he was sane at the time of the alleged offense and that he had the specific mental state required for murder were clearly erroneous. The Court of Appeals—adverting to GCR 1963, 517.1 (now MCR 2.613[C]), providing for appellate review to determine whether findings of fact are clearly erroneous—found the circuit judge's opinion insufficient to permit appellate review and remanded for findings of fact.

[10] MCL 750.529; MSA 28.797.

[11] MCL 750.89; MSA 28.284.

[12] The testimony tended to show that, after being admitted into the home of a former girlfriend and engaging in conversation with her for several minutes, Boyd suddenly grabbed her, held a knife to her throat, and demanded money. Subsequently, Boyd led the woman upstairs where, still in possession of the knife, he grabbed a second woman and threw her on top of a third woman on a bed. Boyd once again demanded money and was told where to find a few dollars in change. After placing the money into a bag, Boyd fled, apparently fearing that one of the women was about to shoot him in the back.

Boyd testified in his own defense. He admitted the incident, saying, "I don't know. One minute we was talking and next minute, before I know it, I had a knife around her side. I was taking her upstairs."

[13] Boyd testified that he had resided in several mental hospitals for varying periods of duration in the fifteen years preceding the trial, that he was a compulsive gambler, that at one time he believed he was Jesus Christ, that he heard voices—including that of the devil—speaking to him, and that he had written letters containing death threats to Presidents Ford and Carter. Boyd's mother testified to his numerous stays in mental hospitals, to his seeing, hearing, and imagining things, and to his belief that he was either Jesus or the devil. Boyd's sister testified that he had a gambling sickness and that his periods of mental illness often included pacing, wild-eyed looks, and foaming at the mouth.

but mentally ill on both charges, and the Court of
Appeals affirmed in an unpublished opinion.

## II

The Code of Criminal Procedure requires that,
where a defendant asserts a jury-submissible de-
fense of insanity, the jury be instructed to "con-
sider separately the issues of the presence or
absence of mental illness and the presence or
absence of legal insanity," and be instructed on
the verdicts of guilty, guilty but mentally ill, not
guilty by reason of insanity, and not guilty.[14]

A defendant may be found *not guilty by reason
of insanity* if, as a result of *"mental illness"* or
"mental retardation,"[15] the defendant—at the time
of the alleged offense—"lack[ed] substantial capac-
ity either to *appreciate the wrongfulness* of his
conduct *or* to *conform his conduct* to the require-
ments of law."[16] (Emphasis supplied.) The Mental

---

Dr. Bruce Danto, a psychiatrist called by the defense, testified that
Boyd was delusional about being Jesus, that he was schizophrenic and
psychotic, and that he was legally insane at the time of the alleged
offense.

Dr. Steven Bank, a forensic psychologist called by the people,
testified that Boyd exhibited antisocial and manipulative behavior,
that at one time he was mentally ill, but that he was not legally
insane at the time of the alleged offense.

[14] MCL 768.29a(2); MSA 28.1052(1)(2).

[15] Although mental retardation—as well as mental illness—may
contribute to legal insanity, there is no verdict of "guilty but men-
tally retarded."

[16] MCL 768.21a(1); MSA 28.1044(1)(1).

A person found not guilty by reason of insanity is committed
immediately to the center for forensic psychiatry for a maximum of
sixty days for examination and evaluation of present mental condi-
tion and determination whether, in the opinion of the examiners, the
person requires further treatment. MCL 330.2050(1); MSA
14.800(1050)(1). Subsequently, the court may direct the prosecutor to
file with the probate court a petition for an order of hospitalization,
MCL 330.2050(3); MSA 14.800(1050)(3), thereby invoking the civil
admission provisions of the Mental Health Code. MCL 330.1400 *et
seq.;* MSA 14.800(400) *et seq.*

Health Code defines *"mental illness"* as *"a sub-stantial disorder* of thought or mood which *significantly impairs judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life."*[17] (Emphasis supplied.)

A defendant may be found *guilty but mentally ill* if the trier of fact finds beyond a reasonable doubt that the defendant (a) "is guilty of an offense," (b) "was mentally ill at the time of the commission of that offense," and (c) "was not legally insane at the time of the commission of that offense."[18]

### III

At common law, the jury in a criminal prosecution ordinarily returned a general verdict—guilty or not guilty. Alternatively, the jury might return with a statement of findings of fact without a general verdict.[19] The court, rather than the jury, would then apply the law to the facts and render the judgment that the law required on the basis of

---

[17] MCL 330.1400a; MSA 14.800(400a).

[18] MCL 768.36(1); MSA 28.1059(1). See n 2.

If a defendant is found guilty but mentally ill, "the court shall impose any sentence which could be imposed pursuant to law upon a defendant who is convicted of the same offense." After commitment to the Department of Corrections, the defendant "shall undergo further evaluation and be given such treatment as is psychiatrically indicated . . . ." Such treatment may be provided by the Department of Corrections or the Department of Mental Health, but a defendant discharged from a facility of the Department of Mental Health before the expiration of his sentence is returned to the custody of the Department of Corrections. MCL 768.36(3); MSA 28.1059(3).

[19] See 4 Blackstone, Commentaries on the Law of England, p 354; 3 Coke's First Institute, p 494; 2 Hawkins, Pleas of the Crown, p 439.

A general verdict is a statement of the jury's decision on the ultimate issues presented for its determination. Findings of fact and application of the law thereto are incorporated within a general verdict, which is announced without identification of supporting facts or reasons.

A statement containing only the jury's findings of fact has often been referred to as a "special verdict."

the facts found by the jury.[20] It appears that the jury returned with only findings of fact and no verdict when it was unsure of the proper application of the law to the facts; it would thereby avoid rendering a "false" general verdict which, before *Bushell's Case,* made the jurors vulnerable to punishment through a writ of attaint.[21]

The jury could not, however, be *required* to return with a statement only of findings of fact, for that would violate what Blackstone described as the jury's "unquestionable right of determining upon all the circumstances, and finding a general verdict . . . ."[22]

There was thus at common law either (i) a general verdict, guilty or not guilty, or (ii) special findings of fact (sometimes called a special verdict), without a determination by the jury of the ultimate question of guilt or innocence. There was not, with the exception of the not guilty by reason of insanity verdict, a combination verdict—a general verdict with special findings.

## A

In civil cases a procedure developed of supplementing the general verdict with a statement of findings of fact, resulting in a combination verdict

[20] At common law, the court might be asked, for example, whether the facts as set forth by the jury constituted murder, manslaughter, or no offense at all. See 4 Blackstone, p 354.

[21] See 2 Thompson, Trials (2d ed), § 2649, p 1929; 4 Blackstone, p 354; 3 Coke's First Institute, p 494.

Jurors no longer may be punished for returning a "false" general verdict. *Bushell's Case,* 124 Eng Rep 1006 (1670). Thus it is no longer asserted that the jury may elect to announce only their factual findings and request the court to apply the law to the facts. But see *People v Wells,* 8 Mich 104 (1860).

[22] 4 Blackstone, p 354.

See also 1 Cooley, Constitutional Limitations (8th ed), p 679:

"[The jury] are not obliged in any case to find a special verdict; they have a right to apply for themselves the law to the facts, and to express their own opinion, upon the whole evidence, of the defendant's guilt."

—a general verdict with special findings. This procedure permitted the court to *require* the jurors—if they returned a general verdict—also to answer special questions concerning specific issues of fact.[23]

In Michigan, the Legislature, in 1871, enacted that in cases involving the trial of factual issues "the court shall, at the request in writing of the counsel of either party, instruct the jury, if they return a general verdict, also to find upon particular questions of fact to be stated in writing, and may direct a written finding thereon," and that "when a special finding of fact shall be inconsistent with a general verdict, the former shall control the latter, and the court shall give judgment accordingly."[24]

Accordingly, under this procedure, a general verdict was set aside if the court determined that it was inconsistent with the jury's answers to special questions. It is apparent that the object of this procedure was to prevent the jurors from misapplying the law to the facts they had found.[25] This Court said that the purpose of requiring the jury to answer special questions was "to test the correctness of their general verdict,"[26] "to enable the court to know what view the jury take of the material issues, and to correct their possibly

[23] See generally 2 Thompson, n 21 *supra,* §§ 2667-2702, pp 1944-1969; 76 Am Jur 2d, Trials, § 1175, pp 138-139.

[24] 1871 PA 54. See also 1948 CL 618.39 (repealed 1961).

On the difference between "special verdicts," see n 19, and the statutory procedure permitting special questions, compare MCR 2.514 with 1948 CL 618.39. See also FR Civ P 49; 2 Thompson, n 21 *supra,* § 2669, pp 1947-1948.

[25] See *Morrow v Comm'rs,* 21 Kan 484, 503 (1879), quoted in 2 Thompson, n 21 *supra,* § 2670, p 1948:

"The main object of special questions is to bring out the various facts separately, in order to enable the court to apply the law correctly, and to guard against any misapplication of the law by the jury."

[26] *Harbaugh v People ex rel Cicott,* 33 Mich 241, 247 (1876).

wrong inferences from the facts which they find to exist,"[27] and to "enabl[e] the court to know whether in finding generally they have properly considered the necessary elements of the finding."[28]

### B

Shortly after the 1871 enactment, this Court held that this statutory procedure, authorizing the submission of special questions to supplement and control a general verdict, did not apply in criminal cases.

In *People v Marion*, 29 Mich 31 (1874), this Court affirmed the defendant's conviction of uttering a forged instrument. The defendant assigned error on the basis of the trial court's refusal to direct the jury to find specially on certain issues of fact.

The Court said that the statute permitting requests for special findings did not apply in criminal cases, observing that "it is one of the most essential features of the right of trial by jury at common law, that no jury should be compelled to find any but a general verdict in criminal cases, and the removal of this safeguard would violate its design and destroy its spirit." *Id.,* p 40. The Court, citing Justice COOLEY's treatise on Constitutional Limitations,[29] said that "very serious questions" "could not fail to be suggested" were the statute construed to apply in criminal cases, *id.,* p 41.[30]

---

[27] *Cole v Boyd,* 47 Mich 98, 100; 10 NW 124 (1881).

[28] *Int'l Wrecking & Transportation Co v McMorran,* 73 Mich 467, 472; 41 NW 510 (1889).

The court was not required to submit questions that could not affect the general verdict, but failure of the jury to answer material questions constituted a mistrial. *Crane v Reeder,* 25 Mich 303, 316, 320 (1872); *Sheahan v Barry,* 27 Mich 217, 224 (1873); *Fowler v Hoffman,* 31 Mich 215, 220 (1875).

[29] 1 Cooley, n 22 *supra,* pp 679-684. The citation in *Marion* was to an earlier edition of Justice COOLEY's treatise.

[30] See also *People v Roat,* 117 Mich 578; 76 NW 91 (1898); *People v Tessmer,* 171 Mich 522; 137 NW 214 (1912).

The predicate of the "very serious questions" is the constitutional right of an accused to a trial by jury. The incidents of that right include a jury empowered—after instruction in the law by the court—to apply the law to the facts as found by the jury and to answer generally, without explication, the ultimate question of guilt or innocence. To call upon the jury to return answers to special questions in addition to, and in explication of, a general verdict would be contrary to an incident of a jury trial in a criminal case. Reluctant jurors might be "catechized" by "a progression of questions each of which seems to require an answer unfavorable to the defendant"; answering special questions may have a "subtle, and perhaps open, direct effect" "upon the jury's ultimate conclusion."[31]

---

In *People v Roat*, p 583, this Court affirmed the defendant's conviction of breaking and entering with intent to commit larceny. As in *People v Marion, supra*, it was the defendant who asserted that the trial court erred in refusing to submit a special question to the jury. Finding no error, the Court said that "[a]ny limitation upon the right of the jury to find a general verdict in criminal cases is against the policy of the law" and, citing *Marion* and Justice COOLEY's treatise, "the right to require answers to special questions in criminal cases would be *revolutionary.*" (Emphasis supplied.)

In *People v Tessmer*, this Court affirmed the defendant's conviction of wilfully mistreating and maiming a horse belonging to another. In contrast with *People v Marion* and *People v Roat*, the trial court in *Tessmer* had submitted special questions to the jury. It appears that the defendant did not argue that submission of the special questions was impermissible per se; instead, he argued that the jury's responses were inconsistent with its general verdict of guilty and that the trial court should have granted his motion to set aside the verdict and enter a verdict of not guilty. Rejecting this argument, the Court—citing *Marion* and *Roat*—said once again that the statute permitting answers to special questions to control a general verdict did not apply in criminal cases and that, in all events, the answers were not inconsistent with the general verdict.

[31] *United States v Spock*, 416 F2d 165, 182 (CA 1, 1969). In this case, the United States Court of Appeals for the First Circuit held that submission to the jury of special questions, to be answered if the jury reached a general verdict of guilty, constituted prejudicial error. While this decision was grounded in the court's supervisory power, *id.*, p 180, the court indicated that the same result might be required

# C

The statute providing for the guilty but mentally ill verdict so impairs the right to a trial by jury. The statute, by requiring that the judge instruct the jury on that verdict, calls upon the jury to provide a special finding in explication of a general verdict of guilty.[32]

# 1

It might be argued that because the jurors retain the option of returning a general verdict of guilty or not guilty, they are not *required* by the inclusion of the special finding of mental illness within the alternative verdict of guilty but men-

by the Due Process Clause and the guarantee of trial by jury, *id.,* p 182.

See also *State v Simon,* 79 NJ 191, 199; 398 A2d 861 (1979) ("The singular vice of special interrogatories, particularly in a criminal trial, is their potential for destroying the ability of the jury to deliberate upon the issue of guilt or innocence free from extraneous influences"); *Heald v Mullaney,* 505 F2d 1241, 1245 (CA 1, 1974), *cert den* 420 US 955 (1975) ("[I]n general, the use of special questions and verdicts in any criminal proceeding, state or federal, is suspect not only as a matter of sound judicial policy but of due process as well"); Amendments to Rules of Civil Procedure for the United States District Courts, 31 FRD 617, 618-619 (1963) (statement of Justices Black and Douglas expressing the view that special interrogatories and verdicts might impair the right to trial by jury even in civil cases); *United States v Ogull,* 149 F Supp 272, 276 (SD NY, 1957), *aff'd sub nom United States v Gernie,* 252 F2d 664 (CA 2, 1958), *cert den* 356 US 968 (1958):

"To ask the jury special questions might be said to infringe on its power to deliberate free from legal fetters; on its power to arrive at a general verdict without having to support it by reasons or by a report of its deliberations; and on its power to follow or not to follow the instructions of the court. Moreover, any abridgment or modification of this institution would partly restrict its historic function, that of tempering rules of law by common sense brought to bear upon the facts of a specific case."

[32] "Guilty but mentally ill" is a conclusory finding that the people have established beyond a reasonable doubt every element—including the mental element—of the charged offense. It is thus in a sense a general verdict in favor of the people on the ultimate issue presented at trial. The verdict also, however, contains, in express terms, a special finding that the defendant was mentally ill at the time of the commission of the offense.

tally ill—as they would be if required to answer special questions—to provide a special finding.[33]

To be sure, the jury is instructed on the general verdicts of guilty and not guilty. Jurors, sworn to render a verdict in accordance with the instructions of the court,[34] are not, however, informed that, even if they should find that the defendant was mentally ill at the time of the alleged commission of the offense, they need not so specially find and may instead, consistent with their oaths, return a general verdict of guilty.

To preserve the right to a general verdict, it would be necessary to instruct the jurors that even if they find facts justifying a special finding that the defendant was mentally ill, but not legally insane, at the time of the alleged commission of the offense, they nevertheless may return a general verdict. To avoid confusing the jurors, it would also be necessary to instruct them on *why* they have the option, if they find the defendant was mentally ill, of returning either a verdict of guilty or a verdict of guilty but mentally ill.

Such instructions are not in fact given;[35] rather, the jurors are instructed that it is their "duty to accept the law" as stated by the court.[36] Jurors instructed on the verdict of guilty but mentally ill, and on the findings required to justify that ver-

---

[33] See *Underwood v People,* 32 Mich 1, 3 (1875); *People v Woody,* 380 Mich 332, 337-338; 157 NW2d 201 (1968).

In light of the alternative verdict of guilty but mentally ill, a verdict of "guilty" implies "guilty and *not* mentally ill at the time of the commission of the offense" and to that extent might not be a general verdict.

[34] MCR 2.511(G).

[35] For a discussion of whether the jury *should* be instructed on jury nullification, the power to acquit without regard to the facts and law, see the opposing opinions of Judge Leventhal and Chief Judge Bazelon in *United States v Dougherty,* 154 US App DC 76; 473 F2d 1113 (1972).

[36] CJI 1:2:09.

dict,[37] will understand that if they find that the defendant was mentally ill, their duty to "accept the law" obliges them to return a verdict, in accordance with their findings, of guilty but mentally ill. They will not understand that it is lawful, although mental illness is found, to return a general verdict of guilty.

The manner in which juries are instructed thus unconstitutionally impinges on the right to a general verdict by in effect requiring, where the jury finds all the elements of the offense and mental illness, that it make a special finding of mental illness in partial explication of its general verdict of guilty.

### 2

The people argue that the purpose of enacting the guilty but mentally ill verdict was "to require judges, juries, and counsel to focus on the critical issue in any insanity case, criminal responsibility, as well as on the frequently distracting issue of

---

[37] In the instant case of *Boyd*, the court instructed the jury:

"There is another verdict completely distinct from the verdict of not guilty by reason of legal insanity which is called guilty but mentally ill.

"However, before you arrive at this verdict, you must be convinced beyond a reasonable doubt that the defendant committed the crime charged and that he was legally responsible for his actions.

"In other words, before returning this verdict, you must have determined two things: first, that the defendant committed the crime or crimes, and second, that the defense of legal insanity does not apply to him.

"In order to return a verdict of guilty but mentally ill, you must find the following beyond a reasonable doubt.

"First, that the defendant committed the crime.

"Second, that at the time of the act he was mentally ill as has been defined.

"Third, that at the time of the act he knew that what he was doing was wrong and he had the substantial capacity to conform his conduct to the requirements of the law which he is charged with violating.

"If you find the defendant committed the crime while responsible but mentally ill, you—then you may return a verdict of guilty but mentally ill."

mental illness" and "to eliminate or substantially reduce *inappropriate* insanity verdicts by compelling all participants . . . to focus on the distinct issues in each case with the hope that the fact-finding process would have less confusion and would be more likely to produce an accurate factual result."[38] (Emphasis in original.)

While the issue of sanity may often be particularly difficult, juries are confronted with other difficult issues in which the need for factual accuracy is no less important to the ultimate decision on the issue of criminal responsibility. Were the need for care in fact-finding sufficient to justify a departure from the general rule that it is impermissible to call upon the jury for special findings, the exception for the issue of sanity might soon expand to include many, perhaps all, elements necessary to establish criminal responsibility, and the general verdict, without explication, might be virtually eliminated.

The people and the accused might be better served by a system in which the jury were required to provide special findings either in lieu of or in addition to a general verdict. We start, however, with the adoption in this state's constitution[39] of the accused's right to a trial by jury, which at common law referred to a jury that ordinarily returned a general verdict without explication. Until this Court decides that the constitution allows a judge to call upon a jury to explain its verdict, the Legislature cannot alter the role of the jury in a manner so inconsistent with the

---

[38] *People v Ramsey,* Brief of Appellee, pp 16-17; *People v Boyd,* Brief of Appellee, pp 16-17.

See also Sherman, *Guilty but mentally ill: A retreat from the insanity defense,* 7 Am J of Law & Medicine 237, 254-255 (1981); Slovenko, *Commentaries on psychiatry and law: "Guilty but mentally ill,"* 10 J of Psychiatry & Law 541, 542-543 (1982).

[39] Const 1963, art 1, § 20.

constitutional right to a jury trial in a criminal
case.

3

A finding of mental illness in the guilty but
mentally ill verdict is not determinative of the
issue of criminal responsibility. A person who is
mentally ill may or may not, under the statute, be
insane. A finding that the defendant was mentally
ill at the time of the commission of the offense is
not therefore inconsistent with either a guilty or
not guilty verdict. Accordingly, a special finding of
mental illness accompanying a general verdict
does not assure that the jury has not misapplied
the law to the facts. In a civil case, a court would
be justified in refusing to submit to the jury a
special question that had so little bearing on the
general verdict.[40]

A finding that the defendant was mentally ill at
the time of the commission of the offense is not a
factual finding, but rather a legal conclusion. To
ensure greater care in fact-finding on the issue of
legal insanity, the jury should be asked:

1) whether the defendant at the time of the offense
had a substantial disorder of
  a) thought, or
  b) mood;
2) if the answer to either 1a or 1b is "yes," whether
such substantial disorder(s) significantly impaired
  a) judgment, or
  b) behavior, or

---

[40] See n 28.

The special finding of mental illness is not harmless. As set forth in
part IV, by focusing jury deliberations on a factor not determinative
of the central issue of guilt or innocence, the guilty but mentally ill
verdict impairs the accused's due process rights to a fair trial and to
be presumed innocent.

But cf. People v Tessmer, 171 Mich 522; 137 NW 214 (1912)
(conviction affirmed where answers to special questions were not
inconsistent with general verdict).

c) capacity to recognize reality, or

d) ability to cope with the ordinary demands of life;

3) if the answers to one or more of 2a, 2b, 2c or 2d are "yes," whether such significant impairment(s) resulted in the lack of substantial capacity either

a) to appreciate the wrongfulness of the defendant's conduct, or

b) to conform his conduct to the requirements of law.


# D

Some courts have said that the use of special questions in criminal cases, while disfavored, is not erroneous per se.[41] The circumstances in which those statements have been made do not, however, provide authority justifying the guilty but mentally ill verdict.


# 1

All would agree that the jurors may, indeed must, be called upon to specify the offense of which they find the defendant guilty. Where there are degrees or lesser included offenses of the charged offense, or the charged offense can be committed by alternative conduct, the accused is in effect faced with multiple charges.

When a jury finds that a defendant so charged is guilty of, say, petty larceny rather than grand larceny, it is necessary for it to distinguish in the guilty verdict whether the defendant committed one offense or another. One may characterize a verdict of guilty of petty larceny as a verdict of

---

[41] See, e.g., Heald v Mullaney, 505 F2d 1241, 1245 (CA 1, 1974), cert den 420 US 955 (1975); United States v Palmeri, 630 F2d 192, 202 (CA 3, 1980), cert den 450 US 967 (1981); United States v Desmond, 670 F2d 414, 416 (CA 3, 1982); United States v O'Looney, 544 F2d 385, 392 (CA 9, 1976), cert den 429 US 1023 (1976).

See generally 3 Wright, Federal Practice and Procedure: Criminal 2d, § 512, pp 7-12; 8A Moore's Federal Practice (2d ed), § 31.02[3], pp 31-7 to 31-12.

guilty of larceny with a special finding of the amount involved in the larceny, but the verdict nevertheless is a general verdict of guilty of the lesser offense of petty larceny. When a jury returns a verdict of guilty of larceny under $100, it is not rendering a special finding explicating a general verdict, but only a general verdict of one of the lesser offenses charged.

Similarly, it is necessary—to avoid convicting a person of first-degree murder unless all twelve jurors concur that he either premeditated and deliberated or that the murder occurred in the perpetration or attempted perpetration of a particular felony—to divide the offense, for purposes of the verdict, into two offenses, so that the verdict makes clear that all twelve have found the defendant guilty of premeditated and deliberated murder or all twelve have found him guilty of murder in the perpetration or attempted perpetration of a particular felony.[42]

The decisions in other jurisdictions stating that special findings are not erroneous per se are principally of that kind.[43]

---

[42] Otherwise, the defendant might be convicted of first-degree murder although only five agree there was premeditation and deliberation if seven, who do not find premeditation and deliberation, agree that the murder was committed in the perpetration of a felony. See *People v Olsson,* 56 Mich App 500; 224 NW2d 691 (1974), *lv den* 394 Mich 772 (1975).

[43] See, *e.g., Commonwealth v Licciardi,* 387 Mass 670; 443 NE2d 386 (1982) (special questions concerning whether general verdict of guilty of first-degree murder was based on deliberate premeditation, extreme atrocity or cruelty, or felony murder); *United States v O'Looney,* 544 F2d 385 (CA 9, 1976), *cert den* 429 US 1023 (1976) (in conspiracy case, special verdict form identified substantive offenses charged as objects of the conspiracy); *Jalbert v United States,* 375 F2d 125 (CA 5, 1967), *cert den* 389 US 899 (1967) (special verdict form calling for special finding on value of stolen postal money orders).

Specification of the offense of which the jury finds the defendant guilty necessarily must precede sentencing. This has led some courts to say that special questions are permissible because of their relevance to sentencing. See, *e.g., Commonwealth v Licciardi, supra,* 387

A finding that the defendant was mentally ill at the time of the commission of the offense is not, however, determinative of either the fact or degree of criminal responsibility. The finding does not convict, exculpate, or reduce the degree of an offense from—taking the example suggested by Ramsey and discussed in the opinion of the Court[44] —second-degree murder to manslaughter.

## 2

In some jurisdictions, the role of the jury has been expanded to include consideration of the appropriate punishment of a convicted felon. In those jurisdictions, the jury may be called upon to

Mass 677, n 4 (specification of facts underlying general verdict of guilty of first-degree murder might justify consecutive sentences for first-degree murder and separate felony); *Jalbert v United States, supra,* p 126 (special finding on value of stolen postal money orders "deals only with punishment, and not with guilt"); *United States v Stassi,* 544 F2d 579, 583 (CA 2, 1976), *cert den* 430 US 907 (1977) (where new federal conspiracy provisions amended the terms of punishment, special questions concerning dates of membership in conspiracy were not error because "the specific information sought is relevant to the sentence to be imposed"). See also FR Crim P 31(e) (authorizing "special verdicts" concerning extent of interest or property subject to criminal forfeiture).

In treason cases, a special finding may be constitutionally required. Because the testimony of two witnesses to the same overt act is required by US Const, art III, § 3, to convict of treason, a special finding that an overt act was established permits the conviction to be sustained on appeal. *Kawakita v United States,* 343 US 717; 72 S Ct 950; 96 L Ed 1249 (1952).

Other than the special finding that may be constitutionally mandated in treason cases, we find no reported case sustaining special findings that might not be determinative of criminal responsibility or sentencing except for two cases where the United States Court of Appeals for the Third Circuit stressed that the defendant had failed to object to the submission of special questions, *United States v Palmeri,* 630 F2d 192 (CA 3, 1980), *cert den* 450 US 967 (1981); *United States v Desmond,* 670 F2d 414 (CA 3, 1982), and one questionable decision of the United States Court of Appeals for the First Circuit where the special questions were based on a defense-sponsored theory of acquittal and the court concluded that the questions did not impair the defendant's right to an independent and impartial jury, *Heald v Mullaney,* 505 F2d 1241 (CA 1, 1974), *cert den* 420 US 955 (1975).

[44] *Ante,* pp 517-519.

provide findings concerning facts that must be established to support imposition of the death penalty.[45]

In Michigan, however, the jury has no role in the determination of penalty or sentencing. It appears, moreover, that the finding of mental illness in the guilty but mentally ill verdict is not supposed to affect sentencing. If a defendant is found guilty but mentally ill, "the court shall impose any sentence which could be imposed pursuant to law upon a defendant who is convicted of the same offense."[46]

3

The not guilty by reason of insanity verdict—like the guilty but mentally ill verdict—calls upon

[45] See, e.g., State v McKenzie, 186 Mont 481, 511; 608 P2d 428 (1980), cert den 449 US 1050 (1980) (additional factual finding whether element necessary for imposition of death penalty was present did not require a fact determination that could be used to undermine the general verdict and thus did not "fall into the vice of a special verdict"); State v Kincaid, 103 Wash 2d 304, 311; 692 P2d 823 (1985) (jury properly instructed that, if they found the defendant guilty of premeditated first-degree murder, they should return a special finding on whether circumstances justifying aggravation of the penalty were established beyond a reasonable doubt).

[46] MCL 768.36(3); MSA 28.1059(3).

One might argue that the guilty but mentally ill verdict does affect sentencing since it appears to require a minimum probation term of five years. MCL 768.36(4); MSA 28.1059(4). This Court has held, however, that the statute establishing the guilty but mentally ill verdict "requires a report on defendant's present mental health prior to sentencing" and "permits a sentencing court to place a defendant on probation for a shorter period than five years and provides for periodic review of the continuing need for treatment and a procedure for discontinuing probation when there is no further need for treatment." People v McLeod, 407 Mich 632, 661; 288 NW2d 909 (1980) (opinion of RYAN, J.) (emphasis supplied); id., p 665, n 2 (opinion of LEVIN, J.). Because under this construction there is in effect no minimum term of probation for defendants found guilty but mentally ill, and because the conditions and period of probation depend in part on reports of the defendant's mental state at the time of sentencing or periodic review, it appears that the special finding by the jury that the defendant was mentally ill at the time of the commission of the alleged offense does not affect a sentence of probation.

the jury to provide a special finding explicating a general verdict. It appears, however, that the not guilty by reason of insanity verdict is an historical anomaly that has been accepted—in Michigan[47]

[47] The only discussion on this question we have been able to find, in Michigan or indeed in any jurisdiction, is a brief dictum in *Underwood v People,* 32 Mich 1 (1875). The defendant, charged with murder, was found not guilty by reason of insanity and, pursuant to 1873 PA 168, committed to the state prison insane hospital. The act provided that when a defense of insanity was asserted in cases involving charges of murder, assault with intent to commit murder, or arson, "it shall be the duty of the jury . . . to find specially whether such defendant was, or was not insane when the alleged crime was committed . . . ." The act further provided for the conditions necessary for release from the state prison insane hospital.

The defendant asserted on appeal that his imprisonment was illegal because the release provisions constituted a denial of liberty without due process of law. This Court agreed and ordered the defendant discharged.

Addressing the defendant's alternative assertion that the act impermissibly authorized a special finding in a criminal case, the Court—in an opinion by Justice CAMPBELL, who also wrote the opinion of the Court in *People v Marion, supra,* said:

"The right of trial by jury is secured by constitutional provisions, and it would not be competent to make any substantial changes in its character. As suggested in *People v Marion,* 29 Mich. R., 31, one of its substantial elements is the right of the jury to give a general verdict on the merits. . . . [W]hile it is not competent to prevent an acquittal on a reasonable doubt of insanity, which would require a general verdict of not guilty, yet if the jury agree that the prisoner was insane, and that he would have been guilty if not so, they are undoubtedly at liberty, though they cannot be compelled, to find that fact specially. We cannot hold a special verdict or finding unauthorized, as the common law furnishes abundant precedents to the contrary.—1 Hale P.C. [History of the Pleas of the Crown], 38." *Underwood v People,* 32 Mich 2-3.

Because the Court ordered the defendant discharged on the ground that the release provisions of the act constituted a denial of due process of law, its discussion of the special finding issue was unnecessary to decision of the case and was thus obiter dictum.

The Court's discussion nevertheless indicates—and Hale confirms—that at common law it was accepted that a special finding of insanity was permitted. See 1 Hale, History of the Pleas of the Crown 28. Although the Court in *Underwood* referred to page *38* of Hale's treatise, that page contains *no discussion of special verdicts or findings.* On page *28,* Hale observes:

"[I]n all cases of infancy, insanity, etc. if a person uncapable to commit a felony be indicted by the grand inquest, and thereupon arraigned, the petit jury may either find him generally *not guilty,* or they may find the matter specially, that he committed the fact, but

and in other jurisdictions[48]—as a singular historic exception to the general rule that a jury may not be called upon for a special finding explicating a general verdict.

Such a discrete and singular exception does not precedentially support unraveling the otherwise clear and undoubted rule that in a criminal case the jury renders a general verdict without explication.

The special finding of mental illness does not serve the same purpose as the special finding of insanity. The purpose of the special finding of mental illness is to assure greater care in fact-finding "to eliminate or substantially reduce *inappropriate* insanity verdicts . . . ."[49] (Emphasis in original.) That special finding thus seeks to justify and explain the general verdict of guilty. The special finding of insanity, however, developed not to assure greater care in fact-finding or in explication of the general verdict, but rather as a means of identifying guilty defendants whom the jury considered warranted pardons from the king, and later as a means of identifying acquitted defen-

_____

that he was *non compos,* or that he was under the age of fourteen, . . . and had not discretion to discern between good and evil . . .; and thereupon the court gives judgment of acquittal." (Emphasis in original.)

[48] In *United States v McCracken,* 488 F2d 406, 418-421 (CA 5, 1974), the United States Court of Appeals for the Fifth Circuit rejected the defendant's assertion that because the only proper verdicts in a criminal case are guilty and not guilty, the not guilty by reason of insanity verdict is impermissible. The court relied in part on its "tacit approval" in prior cases of the not guilty by reason of insanity form of verdict.

After extensive, though perhaps not exhaustive, research, we find no other reported decisions from other jurisdictions that critically examine the assertion that the not guilty by reason of insanity verdict impairs the accused's right to a trial by jury because it calls upon the jury to provide a special finding in addition to a general verdict. The paucity of judicial comment on this issue might be attributable in part to the failure of defendants to challenge an alternative verdict of acquittal.

[49] See n 38.

dants considered sufficiently dangerous to them-
selves and others that they should be confined
until no longer dangerous.[50] The immediate dispo-
sition of the defendant after trial is a direct conse-
quence of the special finding of insanity at the
time of the commission of the offense, and thus
that special finding may be seen as analogous to
other special findings that affect sentencing deci-
sions.

In contrast, the special finding of mental illness
in the guilty but mentally ill verdict does not,
under the statute, affect either the finding of
criminal responsibility or the sentence that may
be imposed on the defendant.

Nor does the special finding of mental illness
determine whether the defendant receives mental
health care and treatment. A defendant found
guilty but mentally ill is required to be and is in
fact processed and dealt with essentially in the
same manner as any other convicted person.

*All* convicted persons are required to receive
psychiatric evaluations within sixty days after
their arrival at a correctional institution.[51] The
statutory requirement that a person found guilty
but mentally ill who, not having been placed on
probation, is committed to the custody of the
Department of Corrections "shall undergo further
evaluation"[52] adds nothing to the statutory provi-
sion for psychiatric evaluation of all convicted
persons who are incarcerated.

[50] See Walker, Crime and Insanity in England: The Historical
Perspective, pp 41-42 (1968); 4 Blackstone, pp 24-25.

Under current practice, a verdict of not guilty by reason of insanity
causes the acquitted defendant to be committed immediately to the
center for forensic psychiatry, and may lead to court-ordered invoca-
tion of the civil admission provisions of the Mental Health Code. See
n 16.

[51] MCL 791.267; MSA 28.2327.

[52] MCL 768.36(3); MSA 28.1059(3).

*All* prisoners, moreover, are granted by statute the right to mental health services, either within the Department of Corrections or, if it is determined that the prisoner is mentally ill or mentally retarded and requires "intensive or specialized care or psychiatric inpatient services," after transfer to the center for forensic psychiatry program within the Department of Mental Health.[53] The statutory requirement that a person found guilty but mentally ill "be given such treatment as is psychiatrically indicated for his mental illness or retardation"[54] does not therefore appear to provide for treatment beyond that otherwise available to all convicted persons.[55]

The provision in the guilty but mentally ill statute requiring treatment that is "psychiatrically indicated" does not confer an absolute right to mental health care and treatment. To the extent that the statutory language *could* be construed to "guarantee" some form of treatment, it appears that "guaranteed" treatment is not being provided either in the Department of Corrections or in the Department of Mental Health.[56] Psychiat-

---

[53] MCL 330.2001-330.2006; MSA 14.800(1001)-14.800(1006).

[54] MCL 768.36(3); MSA 28.1059(3).

[55] If a defendant found guilty but mentally ill is placed on probation, "the trial judge, upon recommendation of the center for forensic psychiatry, shall make treatment a condition of probation" and such treatment "shall be provided by an agency of the department of mental health, or with the approval of the sentencing court and at individual expense, by private agencies, private physicians, or other mental health personnel." MCL 768.36(4); MSA 28.1059(4). Treatment thus is not a mandatory condition of probation unless the center for forensic psychiatry so recommends. Further, a court might make treatment a condition of probation in *any* case where, in the court's judgment, the circumstances may require or warrant such condition. MCL 771.3(4); MSA 28.1133(4).

[56] Pursuant to Ramsey's pretrial motion that the statutory provision establishing the guilty but mentally ill verdict be declared unconstitutional, the circuit judge conducted an evidentiary hearing.

Dr. Dennis Jurczak, Psychiatric Director of the Office of Health Care for the Department of Corrections, testified that, at the time of

the hearing, over 13,600 inmates were in the custody of the Department of Corrections and that approximately seven hundred new inmates were admitted each month. Dr. Jurczak said that he was the only full-time psychiatrist employed by the department, that he treated patients approximately two days per week, and that he was assisted by three consulting psychiatrists, two psychologists, and one social worker. Because of the inadequate number of psychiatric professionals and paraprofessionals available for conducting the initial screening and evaluation of inmates at admission, Dr. Jurczak was unable to estimate how many prisoners were in actual need of psychiatric care.

Dr. Jurczak further testified that, apart from one registered nurse who worked a daytime shift, the department did not have a professional nursing staff, and that nursing duties—including supervising and feeding psychiatric patients and handing them medication—were performed by guards and inmates. He testified to repeated allegations that patients were targets of physical assault—including sexual assault—by the inmate nurses.

Dr. Jurczak testified that psychiatric services were performed on a "crisis basis" and that because of inadequate staffing and facilities many mentally ill inmates were forced to remain in the general prison population where, because they are mentally ill, they are subject to an added risk of assault by other inmates. He testified further that the procedure for transferring patients to the Department of Mental Health was "just a waste of time" because of the delay in obtaining a transfer and because most transferred patients were returned to prison after only a very short stay at a mental health facility.

Dr. Jurczak concluded that "we don't provide adequate treatment for anyone that is mentally ill in our system."

See also *People v McLeod,* 407 Mich 632, 667-669, n 5; 288 NW2d 909 (1980) (opinion of LEVIN, J.).

Dr. Jurczak's testimony was taken over eight years ago. He later reported that a one-hundred-bed ward at Jackson prison was closed and replaced with a seventeen-bed acute care ward and that a new 138-bed psychiatric hospital was opened at the Riverside Correctional Facility in Ionia. He reported a "reasonable degree of care" at Riverside, but also reported a continuing shortage of professional staff. See Brown & Wittner, *Criminal Law, 1978 Annual Survey of Michigan Law,* 25 Wayne L R 335, 361, n 159 (1979).

Commentators who have studied the guilty but mentally ill verdict have expressed doubt that adequate psychiatric care and treatment are provided to persons who have pleaded, or have been found, guilty but mentally ill. See, *e.g.,* Morris, Madness and the Criminal Law, p 87 (1982); Slovenko, n 38 *supra,* p 547 and n 19; Beasley, *An overview of Michigan's guilty but mentally ill verdict,* 62 Mich Bar J 204, 217 (1983); Smith & Hall, *Evaluating Michigan's guilty but mentally ill verdict: An empirical study,* 16 U Mich J L Ref 77, 104-105 and ns 137-138 (1982).

The inadequacy of psychiatric care and treatment at facilities operated by the Department of Mental Health is a matter of public

ric care and treatment are provided to all prisoners, to the extent that such services are available, on the basis of severity of present mental illness and availability of resources, and not on the basis of whether the defendant was found to have been mentally ill at the time of the commission of the offense.[57] The decision to provide mental health care and treatment to a person found guilty but mentally ill is made by physicians and other professionals without regard to, and uninfluenced by, the jury's special finding that the defendant was mentally ill at the time of the commission of the offense.[58]

---

record. Recent investigations of Northville and Ypsilanti regional psychiatric hospitals conducted by the United States Department of Justice indicated deficiencies in staffing, psychopharmacological practices, the use of seclusion and restraint, and the protection of patients from physical harm. Letters of February 19, 1985 to Governor Blanchard from William Bradford Reynolds, Assistant Attorney General, Civil Rights Division. The dangerous atmosphere and lack of professional interaction with patients at Northville have been publicized extensively. See, e.g., Detroit Free Press, July 21, 1985, p 1A, col 1; August 11, 1985, p 3A, col 1.

[57] A recent study conducted by the National Center for State Courts concluded that guilty but mentally ill offenders are no more likely to receive treatment than guilty offenders with mental health problems. Institute on Mental Disability and the Law, National Center for State Courts, The Guilty but Mentally Ill Verdict: An Empirical Study (rev 1985), p E-14.

As part of the study, telephone interviews were conducted with attorneys, judges, mental health forensic examiners and providers, corrections personnel and probation officials in those states that have enacted guilty but mentally ill legislation. While the authors of the study acknowledged that a representative sample might not have been obtained, it is noteworthy that, in Michigan, two mental health care administrators and one forensic psychologist—persons involved in the provision of treatment—confirmed that the post-conviction evaluation and availability of resources, and not the guilty but mentally ill label, are the factors considered in the decision to provide treatment. Two prosecuting attorneys and two judges, however, said that guilty but mentally ill offenders, because of a statutory right to treatment or at least a post-conviction evaluation, are more likely to receive treatment than guilty offenders with mental health problems. Id., pp 2-251 to 2-252.

[58] It appears that, at most, the guilty but mentally ill designation may be a "flag" to officials at the Department of Corrections that may

## IV

The central issue for jury resolution in any criminal case is whether the defendant is guilty or not guilty of the charged offense. The presumption of innocence, both at common law[59] and as a component of due process,[60] requires that the people convince the trier of fact beyond a reasonable doubt of every element of the charged offense.[61]

The sanity of the defendant at the time that the offense was alleged to have been committed is a necessary element.[62] Once evidence of insanity is introduced, the jury may not properly return a verdict of guilty unless it finds beyond a reasonable doubt that the defendant was sane at the time of the commission of the offense. To return a guilty but mentally ill verdict, the jury must find beyond a reasonable doubt that the defendant was mentally ill at the time of the offense and also beyond a reasonable doubt that he was not then insane.

As a conceptual matter, the definitions of "legal

provide a convicted person a better chance of seeing a psychiatrist during initial screening. It also appears, however, that only those prisoners with severe mental illness—and then only if the mental illness is considered treatable and if adequate resources are available—will receive psychiatric treatment.

[59] Although the date of the first formal expression of the principle appears to be in some doubt, "the practice which flowed from it has existed in the common law from the earliest time." *Coffin v United States,* 156 US 432, 455; 15 S Ct 394; 39 L Ed 481 (1895). See also *Woolmington v Director of Public Prosecutions,* 1935 AC 462, 481: "Throughout the web of the English Criminal Law one golden thread is always to be seen, that it is the duty of the prosecution to prove the prisoner's guilt . . . ."

[60] *In re Winship,* 397 US 358; 90 S Ct 1068; 25 L Ed 2d 368 (1970).

[61] *Id.,* p 364.

[62] Initially a defendant is presumed sane. Once any evidence of insanity is introduced, however, sanity becomes a necessary element of the charged offense, and thus the people must establish beyond a reasonable doubt that the defendant was sane at the time of the commission of the offense. *People v Murphy,* 416 Mich 453, 463-464; 331 NW2d 152 (1982).

insanity" and "mental illness" are distinguishable. Indeed, it is asserted that the guilty but mentally ill alternative verdict focuses attention on the definition of insanity and leads to more "accurate" determinations on the issue of criminal responsibility.[63]

Under the statute, before a jury may return a guilty but mentally ill verdict it must find *beyond a reasonable doubt* that the defendant had substantial capacity both to appreciate the wrongfulness of his conduct *and* to conform his conduct to the requirements of law, and, also *beyond a reasonable doubt,* that the defendant had significant impairment of his judgment, behavior, capacity to recognize reality, or ability to cope with the ordinary demands of life.

It is apparent that the statutory definitions of legal insanity and of mental illness contain terms that overlap. The reasonable doubt standard increases the difficulty and complexity of the distinctions that must be made. Most jurors—as well as psychiatrists, lawyers, and judges—might find it difficult to conceive of a substantial disorder of thought or mood that significantly impairs judgment *or* behavior *or* capacity to recognize reality *or* ability to cope with the ordinary demands of life that *might* not also cause *either* a lack of substantial capacity to appreciate the wrongfulness of conduct *or* a lack of substantial capacity to conform conduct to the requirements of law.[64]

## A

It is not, however, a defect of the guilty but

---

[63] See n 38.

[64] See Comment, *The constitutionality of Michigan's guilty but mentally ill verdict,* 12 U Mich J L Ref 188, 196, 198 (1978); Morris, n 56 *supra,* pp 84-85; ABA Standards for Criminal Justice (2d ed), Commentary to § 7-6.10(b).

mentally ill verdict that it requires a difficult decision from the jury on the issue of insanity. The infirmity is rather that the verdict encourages the jurors to focus their deliberations on a question (whether the defendant was mentally ill at the time of the alleged commission of the offense) that is not determinative of the central issue of guilt or innocence.

At one time the law did not distinguish between those who intended the harm caused by their conduct and those who did not. The concept of *mens rea,* culpability, represented an important advance in modifying the harshness of strict liability for harmful conduct, intended or not. Still later those who intended the conduct but who could not distinguish between right and wrong were exculpated as criminally insane, but nevertheless detained until pardoned or released by the king.

It is now firmly established in the law that a person cannot be convicted of an offense on evidence that he intended to commit the act causing the harm where, because he was criminally insane, he did not have the requisite felonious intent.

The not guilty by reason of insanity verdict is a mechanism of that progression, but not an essential element of it. The Legislature could address the seemingly intractable problem of the conflict between the competing goals of bringing to justice those whose conduct causes harm and yet exculpating those whose conduct, however harmful, is not culpable, by eliminating the not guilty by reason of insanity verdict altogether and establishing other means of initially confining those who commit assaultive offenses who are found not guilty and who are thought to have been acquitted because they interposed an insanity defense and

who may be dangerous to themselves or society.[65] Such means are already in place for persons who are so dangerous who have not been charged with committing a criminal offense.

If it is thought that, because of jury confusion, erroneous not guilty by reason of insanity verdicts were or are being returned, that verdict can be abolished, and the jury simply instructed to convict an offender who was only mentally ill and to acquit where the accused is found to have been insane. Problems experienced with the not guilty by reason of insanity verdict do not justify either erosion of the general verdict of guilty or not guilty or changing the focus of the jury's deliberations from simply whether (i) the deed was done, (ii) the accused did it and (iii) he had the requisite felonious intent.

Special focus in the deliberations of the jury or form of verdict on whether the defendant was mentally ill is no more justified than would be special focus on any other element or finding alone insufficient to decide the outcome. "Guilty because the defendant was armed," "guilty because not an accident," "guilty because it was not self-defense," might be general verdicts with special findings along with guilty but mentally ill when—in addition to an insanity defense—the evidence tends to show that the defendant might not have been armed, and a defense of accident or self-defense is also interposed.

Similarly, "guilty *but*" the defendant (i) is only an aider and abettor and not the planner, or (ii) only drove the getaway car, or (iii) did not carry a gun, or (iv) did not fire a gun, are of the same feather as guilty but mentally ill. It would not be

[65] See Morris, n 56 *supra,* pp 53-76; Brooks, *The merits of abolishing the insanity defense,* 477 Annals of the American Academy of Political and Social Science 125 (1985).

determinative in a prosecution for, say, armed robbery whether the defendant carried or fired a gun or merely drove the getaway car or was not the planner but only otherwise aided and abetted the commission of the offense.

Focusing jury deliberation and the verdict form on "guilty because" or "guilty but" an element or finding that alone is not determinative unconstitutionally denigrates the importance of all the other elements the jury is required to consider at the same time. It is a tilt that impairs the presumption of innocence, which requires the people to prove and the jury to find the defendant guilty beyond a reasonable doubt of each and every element comprising the offense.

In sum, the guilty but mentally ill verdict unconstitutionally impinges on the presumption of innocence by focusing the jury's attention on a finding that does not alone support a verdict of guilty.

## B

The guilty but mentally ill verdict introduces a risk that the jury will be misled as to the meaning of that verdict and will in effect decide the issue of criminal responsibility on the basis of speculation or impermissible compromise, thereby depriving the defendant of a fair trial.

### 1

The guilty but mentally ill verdict is misleading in at least two respects.

First, designating "guilty but mentally ill" as one of four possible verdicts unjustifiably elevates the perceived importance of the finding that the defendant was mentally ill at the time of the commission of the offense. To repeat, that finding is of no direct consequence in the disposition of the defendant after trial. To categorize the finding of

mental illness as the same *kind* of decision—that is, one with some distinct, identifiable consequence —as a verdict of guilty or not guilty is to mislead the jurors on the significance of their finding and thus on the meaning of their verdict.

Second, the label of the verdict, "guilty *but* mentally ill," is itself misleading. Many jurors will assume erroneously that the verdict reflects a finding of diminished culpability and criminal responsibility.[66]

## 2

The guilty but mentally ill verdict may be especially misleading because, in spite of the rule— today reaffirmed by the Court—that the jurors should confine their deliberations to the issue of guilt or innocence and should not consider the potential disposition of the defendant after their verdict, the jury may focus on perceived differences in the disposition of the defendant under the various verdict alternatives.[67] It is likely that jurors, and indeed some judges in bench trials, will consider the possibility that their verdict may

[66] See Slovenko, n 38 *supra*, p 544; Britton & Bennett, *Adopt guilty but mentally ill?—No!*, 15 U Toledo L R 203, 212 (1983).

[67] In *People v Goad*, 421 Mich 20; 364 NW2d 584 (1984), concerning jury instructions on the disposition of a defendant found not guilty by reason of insanity, this Court held prospectively that jurors shall not be given any information regarding the disposition of the defendant after such a verdict.

In the instant case of *Boyd*, the court instructed the jury on the disposition of a defendant found not guilty by reason of insanity and on the disposition of a defendant found guilty but mentally ill. The jury was instructed that the guilty but mentally ill verdict "imposes upon the Department of Corrections an obligation to provide appropriate psychiatric treatments during the period of imprisonment . . . ." Given the likelihood, availability and quality of treatment, see ns 56-58, this instruction was misleading.

The Court's decision today that the rationale of *Goad* should be extended prospectively to prohibit instructions on the disposition of a defendant found guilty but mentally ill will eliminate this misleading instruction for future cases. The jury will, however, be left to speculate, most likely inaccurately, on the disposition of a defendant found not guilty by reason of insanity or guilty but mentally ill. See n 70.

influence whether or when a defendant—who has asserted publicly a previous mental illness resulting in a lack of substantial capacity to appreciate the wrongfulness of otherwise criminal behavior or to control that behavior—will be released back into society. Jurors, without instruction by the court, may speculate—correctly—that a defendant found guilty but mentally ill may receive a prison sentence; they may also, however, speculate—erroneously—that they can ensure psychiatric care and treatment for the defendant by finding him guilty but mentally ill.

### 3

The guilty but mentally ill verdict introduces a risk that the trier of fact will reach the decision on criminal responsibility as a result of impermissible compromise. In particular, there is a risk that the trier of fact will, in lieu of reaching a considered and deliberated decision on whether the defendant was legally insane under the statutory definition, "settle" on a perceived intermediate verdict that appears to designate the defendant as criminally responsible and yet *deserving* of psychiatric care and treatment.

It is immaterial whether this compromise might occur *between* members of the jury during their joint deliberations, or merely *within* the reflective deliberations of a single juror. The presumption of innocence is overcome only if *all* jurors agree that every element of the charged offense has been established beyond a reasonable doubt. If one or more jurors who are not persuaded of the defendant's sanity beyond a reasonable doubt agree to the guilty but mentally ill verdict as a compromise, the defendant has not received the full protection of the presumption of innocence and of any reasonable doubt.

In rejecting the argument that the guilty but mentally ill verdict creates an unjustifiable risk of compromise, the opinion of the Court observes that the prior decisions of this Court[68] ordering new trials because of an impermissible risk of compromise "were based on the reality that compromise does occur, and, therefore, the boundaries within which it occurs must be legally and factually supportable."[69]

In the prior cases, the impermissible risk of compromise occurred where convictions on lesser offenses were obtained after jurors were instructed on greater charges that, as a matter of law, were not established factually. To use the language of the Court, the "boundaries" of compromise were not "legally and factually supportable."

Nor is a verdict of guilty but mentally ill legally and factually supportable. The finding of mental illness at the time of the commission of the offense has no identifiable effect, in law or in fact, on issues of criminal responsibility, sentencing, or psychiatric care and treatment. It is no better and no different than would be encouraging jury compromise by providing the jurors with an alternative verdict of guilty *but* the defendant (i) is an aider and abettor and not the planner or (ii) only drove the getaway car or (iii) did not carry a gun or (iv) did not fire a gun. Those "but" verdicts, like the "but mentally ill" verdict, would have no identifiable effect, in law or in fact, on criminal responsibility, sentencing, or psychiatric care and treatment. A verdict that has no such identifiable effect introduces an unjustifiable risk that the trier

---

[68] *People v Stahl,* 234 Mich 569; 208 NW 685 (1926); *People v Gessinger,* 238 Mich 625; 214 NW 184 (1927); *People v Vail,* 393 Mich 460; 227 NW2d 535 (1975).

[69] *Ante,* p 516.

of fact will reach the decision on criminal responsibility as a result of impermissible compromise.

Recognizing that unidentifiable compromise does occur, it is as unsupportable and prejudicial to a defendant to require jurors to focus specially on the nondeterminative finding of mental illness and consider the verdict "guilty but mentally ill" as it is to permit them to deliberate on a finding and verdict that is unsupported by the evidence.

## V

Boyd was found guilty but mentally ill by a jury. For the reasons set forth in this opinion, I would reverse the Court of Appeals affirmance of Boyd's convictions and remand for a new trial where the possible verdicts on each charge are guilty, not guilty, or not guilty by reason of insanity.[70]

Ramsey waived his right to a jury trial and was found guilty but mentally ill by the circuit judge. Because it appears that Ramsey's decision to waive a jury trial may have been influenced by the circuit judge's denial of his motion that the statute establishing the guilty but mentally ill verdict be declared unconstitutional, I would reverse the Court of Appeals affirmance of Ramsey's conviction and remand for a new trial where the possible verdicts are guilty, not guilty, or not guilty by reason of insanity, and would allow Ramsey to withdraw his waiver of a jury trial.

CAVANAGH, J., concurred with LEVIN, J.

RILEY, J., took no part in the decision of this case.

---

[70] I repeat that the Legislature may abolish the not guilty by reason of insanity verdict. See n 65 and accompanying text.